UNITED STATES of America, Plaintiff,

v.

**Maile Jean ROPER, Defendant.**

Civ. No. 85-0315-P.

United States District Court,
D. Maine.

March 3, 1988.

David R. Collins, Asst. U.S. Atty., Portland, Me., for plaintiff.

Charles D. Jamieson, Potter & Jamieson, Saco, Me., for defendant.

## DECISION AND ORDER

GENE CARTER, District Judge.

### I. Introduction

In August, 1980, Defendant Roper, a newly graduated osteopathic physician, agreed with the U.S. Public Health Service to work for two years in a high-need area of Maine to repay Health Service Scholarships she received in medical school. After serving approximately 18 months of her two-year commitment in Bradley, Maine, a designated high-need area, Dr. Roper moved to Saco, Maine, and joined a private practice there. Saco is not a designated high-need area. Consequently, Defendant

was declared to be in default of her Health Service obligations, and was informed of her options for curing the default. The options were 1) to serve the remaining six months of her obligation in a high-need area, 2) to pay off the remaining scholarship obligation, or 3) to apply for a hardship waiver which, if granted, would cancel her remaining obligation to the Health Service.

Because of multiple emotional and physical troubles she and her three children were undergoing, she applied for a waiver on July 7, 1982. When the Health Service denied it two years later, she opted to serve her remaining six-month commitment. The Health Service offered her alternative positions in three high-need areas. Defendant rejected all three, ultimately agreeing to pay the remaining debt. She was again declared to be in default. The Health Service initiated this action to collect on Defendant's debt.

Defendant claims that, because of alleged prior verbal assurances that she would be granted a hardship waiver, the Health Service was estopped from denying her one when she formally applied for it. She claims, in the alternative, that this Court should review and overturn the Health Service's decision to deny her hardship waiver.

The matter was tried before this Court on February 11–12, 1988. For the reasons stated herein, the Court finds that the Health Service is not estopped from denying Defendant's hardship waiver, and that the Health Service's decision to deny the waiver was not arbitrary and capricious, and must, therefore, stand.

## II. Factual Background

In 1977 through 1979, while a student at the Kansas City College of Osteopathic Medicine, Defendant received approximately $25,000 in financial aid from the National Health Service Corps Scholarship Program. After completing medical school and a one-year residency at Maine Medical Center in Portland, Maine, Defendant entered into a "Private Practice Agreement" with the Health Service. Under that agreement, the Health Service agreed to release Defendant from her debts if she agreed to operate a full-time private clinical practice for two years in a "Health Manpower Shortage Area." [1]

Defendant arranged with the Health Service to serve in Bradley, Maine. Shortly before she was to begin practice there, her husband committed suicide. She nevertheless moved to Bradley in July, 1980, with her three children, and set up practice as agreed. She did not, at that time, inform the Health Service of her husband's suicide.

Because Bradley was economically depressed, Defendant's practice there was insufficiently lucrative to meet her family's

1. The Private Practice Agreement Defendant signed (Joint Exhibit 1) reads, in pertinent part:

"Section 753 of the Public Health Service Act (42 U.S.C. 294v) authorizes the Secretary of Health and Human Services ("Secretary") to release an individual from all or part of his or her service obligation incurred by entering into a National Health Service Corps Scholarship (section 751 of the Public Health Service Act (42 U.S.C. 294t)) Contract, if the individual enters into the full-time private clinical practice of his or her profession in a health manpower shortage area.

.     .     .     .     .

[Dr. Maile J. Roper] agrees to enter into the full time private clinical practice as a Doctor of Osteopathy conducting a Family Practice in the Bradley Service Area in Penobscot County, Maine, a designated health manpower shortage area, from August 1, 1980, to August 1, 1982.

.     .     .     .     .

[Dr. Maile J. Roper] agrees to repay the Federal Government an amount determined under the formula in section 754(c) of the Act if [she] fails to begin or complete the obligation to enter into full-time private clinical practice ... of [her] profession.

.     .     .     .     .

[The Secretary] agrees to release [Dr. Roper] from [her] service obligation.

.     .     .     .     .

[The Secretary] agrees to consider under the criteria in section 754(d) of the Act any request made by [Dr. Roper] for a waiver of [her] private practice obligation or default repayment obligation."

A "Health Manpower Shortage Area" is defined in 42 U.S.C. § 254e(a)(1)(A) as "an area in an urban or rural area ... which the Secretary determines has a health manpower shortage and which is not reasonably accessible to an adequately served area."

financial needs, so she worked weekend shifts in hospital emergency rooms in Bangor and Fort Kent. Her children, struggling from the effects of the move and of their father's suicide, had serious adjustment problems and were placed in private schools. A series of housekeepers tended to the children while Defendant worked.

In early summer, 1981, Defendant was approached by Craig Wallingford, a medical school classmate, about joining his private practice in Saco, Maine. Thereafter, she inquired at Health Service headquarters in Boston, Mass., about obtaining a hardship waiver that would permit her to leave Bradley before completing her two-year commitment. Defendant claims she understood, from her discussions with unidentified Health Service representatives,[2] that because of her family and financial troubles, she qualified for and would be granted a hardship waiver.

On January 17, 1982, Defendant and her children moved from Bradley to Saco, and Defendant entered practice with Dr. Wallingford. Defendant claims she repeatedly informed Health Service representatives in Boston of her move and her continued willingness to fulfill her remaining six-month obligation. The children, increasingly distressed, were again placed in private schools and enrolled in rigorous counseling programs.

On June 8, 1982, Defendant was declared in default of her Health Service obligations. On July 7, 1982, Defendant submitted to the Health Service her first written waiver request, describing briefly her family and financial problems and her belief that living and practicing in Saco would relieve them. She was informed that the Health Service needed more comprehensive documentation of her difficulties in Bradley to rule on her waiver request. Despite three reminders over a 22–month period, Defendant did not supply the requested documentation. In December, 1983, her account was assigned to Skyline Credit Corp. for collection.

In January, 1984, Defendant retained Deborah Hjort, an attorney, to process her waiver request. In Ms. Hjort's first letter to Skyline Credit on Defendant's behalf, she indicated Defendant's intent to satisfy her Health Service obligations by obtaining a hardship waiver or serving her remaining time. She also represented that Defendant believed she had been granted a waiver in her earlier discussions with Health Service representatives in Boston. This was the first written communication to the Health Service and its agent, Skyline Credit, of Defendant's alleged belief that she had already been granted a waiver.

On June 11, 1984, Defendant finally submitted documentation to support her waiver request. On July 12, 1984, the Health Service denied her request, finding that she had adequate finances to serve or pay her obligations, and that her family's troubles were not interfering with her "ability to function as a physician." The Service also denied Defendant's request that her part-time practice in Waterboro, Maine, be deemed a high-need area at which she could serve her remaining six-month obligation. The Service reminded Defendant of her right to serve her remaining six months at a designated high-need area, but urged her to structure a repayment plan with Skyline Credit.

On August 15, 1984, Defendant signed a Forebearance Agreement with the Health Service, under which the Health Service agreed to suspend collection efforts if she agreed to serve her remaining six-month obligation at a high-need area. One month later, Defendant submitted a detailed summary of her debt history and family difficulties, declared her decision to serve her remaining obligation, and requested that she be assigned to a clinic in Jonesport, Maine. Her request was approved, and she arranged to move to Jonesport in January, 1985, for six months.

2. Defendant does not recall, and has no written record of, the person with whom she spoke. She testified that she believed it was William McKenna, but acknowledged that she is uncertain and that it could have been someone else. Mr. McKenna, current chief of Boston's Scholarship Division, has testified that he had not yet been transferred to that division when Dr. Roper is alleged to have made her first telephone inquiry.

Despite the relative stability of their life in Saco, however, Defendant's children became progressively troubled between 1982 and 1984. Her eldest child had become obese, reclusive and suicidal, and revealed that she had been sexually abused prior to her father's suicide. Her middle son had become violent and withdrawn. Defendant decided, allegedly on these bases, that she could not move to Jonesport as planned, and informed the Health Service on December 12, 1984, of her need for an alternative assignment.

Between January and May, 1985, on Defendant's request, the Health Service offered her two more high-need area assignments, in Bingham and Bethel, Maine. Both required long-distance travel or relocation. She rejected both, allegedly because she believed her prolonged absence would seriously jeopardize her children's well-being.

In May, 1985, the Health Service again declared Defendant to be in default. On October 11, 1985, the United States filed in this Court a complaint alleging the default. On September 22, 1986, after the case had been called for trial, the Health Service consented to review Defendant's waiver request, and the Court stayed the action to facilitate that review. *See* n. 8 *infra* at 87.

The case was tried before this Court on February 11 and 12, 1988. Defendant testified that she was assured of a hardship waiver in her first discussions with Health Service representatives in late 1981. She claims that, because she relied on these assurances in deciding to leave Bradley, the Health Service is estopped from denying the waiver now. She claims, in the alternative, that this Court should review the Health Service's decision to deny her waiver request because, she claims, that decision was unwarranted and should be reversed.

## III. Estoppel Claim

As a general rule, the validity, interpretation and construction of contracts with the federal government, including the rights and obligations of the parties thereto, is governed by principles of federal contract law. *Priebe & Sons v. United States*, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). Federal law makes clear that estoppel is rarely, if ever, a valid defense against the government absent proof of some affirmative misconduct by a government agent. Further, estoppel against the government cannot be premised on oral representations. *Heckler v. Community Health Services of Crawford Co.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

To the extent that a party may ever successfully claim estoppel against the Government, the party must first demonstrate that the traditional elements of estoppel are present.[3] In the instant action, this means Defendant must show that the Health Service knowingly induced her to believe what was untrue, and thereby induced her to take action she would not otherwise have taken. Defendant must establish that she relied, reasonably and to her detriment, on Health Service representations. *Heckler*, 467 U.S. at 59, 104 S.Ct. at 2223.

In the factual context of this case, this requires Defendant to prove: that Health Service representatives in Boston induced her to believe she would be granted a hardship waiver, knowing she would not be granted one; that the Health Service's alleged assurances induced her to leave Bradley before completing her commitment there, causing her to default on her Health Service obligations; and that, without the alleged assurances that a hardship waiver would be granted, she would not have left Bradley before the end of her

---

**3.** The United States Supreme Court, in *Heckler*, ruled that proving the traditional elements of estoppel was merely a threshold to proving that defense against the government. It did not assert that a party who successfully establishes these elements is entitled to estop governmental action. In *Heckler*, the court found it unnecessary to determine what additional burdens a party seeking to estop the government would bear, because the party in that action was unable to prove the traditional elements. *See Heckler*, 467 U.S. at 60–61, 104 S.Ct. at 2224. The same is true here.

two-year commitment. The evidence adduced at trial is simply insufficient to satisfy these elements.

## A. Knowing Inducement

Defendant must first establish that Health Service representatives assured her she would be granted a hardship waiver, knowing no such waiver would, in fact, be granted. Defendant asserted at trial that she spoke with a Health Service representative in Boston in the late summer or early fall of 1981, described her family and financial troubles and inquired about the likelihood of a hardship waiver. She initially testified that she understood, from this conversation, that she would qualify for a waiver. When pressed, she claimed that she was specifically told she would be granted a waiver if she applied for one.

Defendant offered no evidence beyond her own testimony that she called Boston in 1981. Nor did she offer corroborating evidence that Health Service representatives in Boston assured her that a hardship waiver would be granted. She took no notes of the alleged phone call. She secured no written confirmation of the alleged assurances. Nowhere in the voluminous correspondence she exchanged with the Health Service between 1982 and 1987 did she affirmatively claim that she had been assured a hardship waiver. To the contrary, she wrote in 1984 that the Boston representatives had made "no guarantee" that she would be granted a waiver. (Joint Exhibit 7)

Capt. Joseph Hayden, Director of the Health Service's Scholarship Division, testified that all waiver decisions are made by the Director of the Division of Health Service Scholarships in Rockville, Maryland, and that the Boston representatives with whom Defendant allegedly spoke in 1981 could not have assured Defendant that a waiver would be granted because they had no authority to make such a determination. He testified further that the representatives in Boston knew, or should have known, that they had no authority to grant, or assure the granting of, waivers.

William McKenna, the current Director of the Scholarship Division in the Health Service's Boston Regional Office, testified that employees in his office do, in fact, know that they have no authority to grant or assure hardship waivers. His office's authority, he said, has been limited to recommending to the Maryland Headquarters Office the disposition of waiver requests. He testified that although the person to whom Defendant spoke may have sympathized with her and suggested that she submit a formal waiver request, that person would not have promised a waiver or even have encouraged Defendant to act on the belief that one would be granted. He testified that waivers are never granted on the basis of oral representations. Waiver requests, he said, must be thoroughly documented, and are granted in writing by the Scholarship Division Director in Maryland.

This suggests not only that Boston representatives did not give the alleged assurances because they knew they had no authority to do so, but that, if they did so assure Defendant, they were acting beyond the scope of their authority. The Health Service would not be estopped by the action of an agent acting without authority or contrary to law. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

The evidence simply does not support Defendant's claim that Boston representatives assured her, during a phone conversation in 1981, that a hardship waiver would be granted.

## B. Reliance

Even if Defendant had established that the Health Service assured her a waiver in 1981, she must then establish that she relied, both reasonably and detrimentally, on those alleged assurances. Defendant attempted to fulfill this requirement by testifying that she decided to leave Bradley only after speaking with, and allegedly being assured by, Health Service representatives in Boston. Without Boston's alleged assurances that a waiver would be granted, she claimed, she would not have left Bradley before the end of her two-year commitment, and thus would not have defaulted

on her Health Service obligation. Again, however, the evidence adduced at trial does not support her allegations.

Defendant testified at trial that by late 1981, she had already decided not to remain permanently in Bradley. She testified that in early summer 1981, well *before* she called Boston, Dr. Craig Wallingford approached her about joining his private practice in Saco. She testified that she believed she had to accept the Wallingford offer and begin practicing in Saco by January, 1982, or risk losing the opportunity altogether. This suggests that Defendant relied not on the Health Service's alleged assurances of a hardship waiver, but on Dr. Wallingford's attractive proposal and significant time constraints, in deciding to leave Bradley in January, 1982.

The documentary evidence submitted by the Health Service—much of it written by Defendant herself—supports the conclusion that Defendant did not rely on alleged Health Service representations when she decided to leave Bradley before the end of her commitment. Defendant's first written waiver request, submitted in July, 1982, made no mention of her phone conversation with Boston or the alleged assurances that a waiver would be granted.

In September, 1984, two months after Defendant's first waiver request had been denied, Defendant renewed her waiver request by submitting to the Health Service a comprehensive summary of her debt history, family and financial troubles, and move from Bradley to Saco. For the first time, she mentioned her conversation with Health Service representatives in Boston.

"Approximately six months before I left Bradley, I began to talk with Public Health Service representatives in Boston. I explained my situation ... and asked about the possibility of having the last six months of service waived. The Boston representatives responded quite positively to my pleas and indicated that a hardship waiver for the six month period would probably be obtainable. *They were clearly not making a guarantee, and I understood that, if I decided to leave Bradley before completing the full two years, I would be taking a risk.*"

(Joint Exhibit 7) (emphasis added). She explains, however, that because of the significant professional and personal advantages of practicing in Saco, she "decided to take the risk[.]"

This suggests a clear understanding that 1) no waiver had been granted or assured when she decided to leave Bradley six months before completing her commitment, and 2) she recognized the possibility that the waiver might be denied, and *decided nonetheless* to leave Bradley. This establishes persuasively that Defendant did not rely on the Health Service's alleged assurances that she would get a hardship waiver when she decided to leave Bradley early.

Her subsequent correspondence with the Health Service bolsters this conclusion. In her final waiver request, submitted after the instant collection action had been filed, and well after she had moved to Saco, she again described her initial conversation with Health Service representatives in Boston.

"I explained my situation and asked whether I was qualified for a hardship waiver. During that first conversation, I was told that I fit the guidelines, and that there would *probably* be no problem."

(Joint Exhibit 10) (emphasis added). Again, she acknowledged the risk that there *could* be a problem by using the word "probably." Nowhere does she use the strong language to which she testified at trial that she was "told specifically" that the Health Service would grant her a waiver if she applied for one.

Finally, Defendant acknowledged repeatedly, in correspondence with the Health Service between her departure from Bradley and the time of trial, that she had a six-month remaining commitment to the Health Service. Only once did her attorney, Ms. Hjort, state in a letter that Defendant believed a waiver had been granted before she left Bradley. This representation is resoundingly refuted by the evidence. At no other time did Defendant convey to the Health Service her alleged

belief that a waiver had been granted or assured. At no time before this action commenced did she protest the Health Service's collection proceedings on the basis that her remaining six-month obligation had been forgiven.

The Court finds that Defendant did not rely on the Health Service's alleged assurances that a hardship waiver would be granted in deciding to leave Bradley early. This, coupled with the Court's belief that no such assurances were ever made, defeats Defendant's estoppel claim.

### IV. Review of Waiver Denial

Defendant claims that, because she was adversely affected by the Health Service's decision to deny her waiver request, she is entitled to judicial review of that denial. The Health Service claims, in contrast, that because Defendant did not expressly claim that its decision was arbitrary and capricious, she is barred from seeking judicial review. It claims, in the alternative, that the Court's inquiry is limited to whether the Health Service's denial of Defendant's waiver was arbitrary and capricious or an abuse of discretion.

■ The Court must conduct a two-pronged inquiry to determine 1) whether it may review the Health Service's denial of Defendant's waiver request, and if so, 2) by what standard. Judicial review is made available under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.[4] Judicial review is precluded, however, where the statute authorizing the challenged agency action specifically prohibits or restricts it, or where the agency action has been committed to agency discretion by law. 5 U.S.C. § 701(a).

The statute under which the Health Service denied Defendant's waiver request authorizes it to waive or suspend a person's service or financial obligation whenever compliance is impossible or would cause extreme hardship to the individual, or when

enforcing the obligation would be unconscionable. 42 U.S.C. § 254o(c)(2). The statute does not specifically prohibit or restrict judicial review of the Health Service's waiver determinations. The Health Service does not dispute this.

Nor has waiver determination been committed to the Health Service's discretion by law. The "agency discretion" limitation on judicial review applies only in those rare instances where the statute is drawn in such broad terms that in a given case the reviewing court has no meaningful standard against which to judge the agency's exercise of discretion. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The regulations governing the Health Service's waiver determinations are specific and narrowly tailored. They expressly require the Health Service to consider, in ruling on a waiver request, the debtor's present and future financial status and personal problems to the extent they impinge on the debtor's ability to fulfill her obligations. 42 C.F.R. § 62.12. If the debtor is found by the Health Service to be unable to repay or serve, a waiver is granted. If family and financial problems do not make repayment or service impossible or an extreme hardship, the waiver is denied. Thus, the law is not so broadly drafted as to deny the Court guidance in reviewing the Health Service's decision.

Further, the Health Service is possessed of no special expertise in weighing the personal and financial factors set out by the statute governing waiver requests. Thus, the matter is appropriate for judicial review. *Natural Resources Defense Council, Inc. v. Securities and Exchange Commission*, 606 F.2d 1031 (U.S.App.D.C.1979). The Court rules, on these bases, that waiver determinations have not been committed to the Health Service's discretion, and that judicial review is not barred.

Having determined that judicial review is permitted, the Court must determine the applicable standard of review. Under the

---

**4.** The parties agree that the Administrative Procedure Act governs this Court's review of the Health Service's decision to deny Defendant's waiver request.

APA, agency action can be overturned on any one of six bases.[5] In all cases agency action must be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it failed to meet statutory, procedural, or constitutional requirements. *Overton Park*, 401 U.S. at 414, 91 S.Ct. at 822, citing 5 U.S.C. §§ 706(2)(A–D). In certain narrow circumstances, the agency action must be set aside if it is unsupported by "substantial evidence." 5 U.S.C. § 706(2)(E). In other equally narrow circumstances, the reviewing court is permitted to conduct *de novo* review and set aside agency action "unwarranted by the facts." 5 U.S.C. § 706(2)(F).

██ Defendant claims that *de novo* review of the Health Service's decision to deny her hardship waiver is warranted. *De novo* review of agency action is authorized under the APA in only two circumstances: when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action; and when the challenged agency action is adjudicatory in nature and the agency factfinding procedures are inadequate. *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. Defendant claims that the Health Service's failure to make factual findings when it denied her waiver request entitles her to *de novo* review under the latter provision.

██ It is unclear, however, whether the Health Service's ruling on Defendant's waiver request was adjudicatory within the meaning of this provision. Even if it were, the Health Service made specific and adequate findings of fact[6] when it denied Defendant's waiver request, and reported these findings to Defendant in its letter dated July 12, 1984 (Joint Exhibit 6).[7] Thus, the provision for *de novo* review where factfinding in an adjudicatory proceeding is inadequate does not apply here. Defendant does not claim that the "new issues" provision applies. Therefore, *de novo* review is unwarranted in this instance.

The Court must therefore conduct a "thorough, probing, in-depth review" of the Health Service's waiver denial. *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. The Court must first determine whether the Health Service acted within the scope of its authority. *Id.* As suggested, the Health Service is authorized to waive a debtor's obligations if it determines that enforcing the service or payment obligation would impose "an undue hardship and [be] against equity and good conscience." It has the discretion to deny a waiver if, after evaluating the debtor's financial and personal circumstances, as it is required by Health Service regulations to do, it determines that compliance would not be impos-

5. Title 5 U.S.C. § 705 provides, in pertinent part: The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be:
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;
   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
   (D) without observance of procedure required by law;
   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

6. The statutes and regulations governing the waiver process, 42 U.S.C. § 254*o*(c)(2) and 42 C.F.R. § 62.12 respectively, do not require the

Health Service to make formal findings of fact when it rules upon a debtor's waiver request.

7. In a letter from James H. Daugherty, Director of the Division of Health Services Scholarships, to Deborah A. Hjort (Joint Exhibit 6), the Health Service announced its denial of Defendant's waiver request, finding:
   1. that Defendant had obtained the medical degree for which her scholarship was awarded;
   2. that, although Defendant's family had undergone "considerable stress," her family troubles did not appear to have impaired her ability to function as a physician;
   3. that, after considering Defendant's prior service, her family troubles and financial difficulties, "there is no evidence that compliance with [her] service or payment obligation is impossible or would cause extreme hardship;" and
   4. that Defendant was practicing full-time, and was therefore capable of paying or serving her obligation.

sible or cause extreme hardship. 42 C.F.R. § 62.12.

Congress has thus afforded the Health Service just two options in ruling on waivers. It may find that personal or financial troubles make service or repayment impossible or extremely difficult and waive the debtor's remaining obligation. Or, it may determine that the debtor is able, despite personal difficulties, to repay the obligation, and deny the waiver. In determining whether the Health Service's decision to deny Defendant's waiver request fell within the scope of its authority, the controlling issue is whether its decision fell reasonably within this range. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. Clearly, it did.

Thus, the Court must proceed to the next inquiry: whether the Health Service's denial of Defendant's waiver request was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To make this determination, the Court must assess whether the Health Service considered the relevant factors and whether it made a clear error of judgment. The Court makes this determination from the record before the Health Service at the time it ruled on Defendant's waiver request. 5 U.S.C. § 706; *Cooperative Services, Inc. v. U.S. Dept. of Housing and Urban Development*, 562 F.2d 1292 (U.S.App.D.C.,1977). And "[a]lthough the inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824.

First, a look at the applicable law. To grant a waiver on the grounds that compliance is impossible, the Health Service must find "that the participant suffers from a physical or mental disability resulting in the permanent inability ... to perform the service or other activities ... necessary to comply with the obligation." 42 C.F.R. § 62.12(c).

To grant a waiver on the grounds that compliance would result in undue hardship, the Health Service must consider the debt-

or's present and future financial status, and the debtor's personal troubles, but only to the extent that they "so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation." 42 C.F.R. § 62.12(d). Thus, the Health Service's decisions on waivers are strictly limited to practical concerns: if the debtor's financial and personal difficulties do not "impair her ability to function as a physician" (*See* n. 7, *supra*), no waiver is warranted, regardless how worthy of sympathy those difficulties are.

■ Looking to the record before the Health Service at the time of its denial, in light of the foregoing legal provisions, the Court finds that the denial breached none of the standards enumerated in the APA. The Health Service acknowledged that Defendant and her family had undergone significant turmoil during its 18–month stay in Bradley. It determined, nonetheless, that the turmoil had not reduced Defendant's ability to practice, and that she was therefore able to fulfill her scholarship repayment obligation.

This conclusion is amply supported on the record. While in Bradley, despite her family disturbances, Defendant worked full-time at her private practice, and part-time at neighboring hospital emergency rooms. At no time did she reduce her work schedule to accommodate family needs. In fact, she testified at trial that a significant portion of her family's difficulties were caused by her prolonged absences from the home, which in turn were caused by her rigorous work schedule. Where the Health Service must confine its consideration of Defendant's financial and family troubles to the effect they had on her ability to work, it is justified in finding that that effect was not sufficient to justify a waiver. Its decision in this respect was based on consideration of the appropriate statutory and regulatory factors, and was not a clear error of judgment. It therefore survives judicial scrutiny.

Finally, the Court must determine whether the Health Service's denial of Defendant's waiver request followed the neces-

sary procedural requirements. Defendant does not allege procedural violations, and indeed would not be justified in doing so. Defendant was repeatedly notified of her default and her options for curing it. Although the Health Service statute does not require that waiver seekers be granted a formal hearing, Defendant was afforded numerous chances to be heard. On at least three occasions, she submitted extensive documentation in support of her waiver request. The record suggests that on each occasion, that documentation was examined and considered in the subsequent waiver denial.

Further, the Health Service accommodated Defendant's numerous requests for special and alternative assignments.[8] The Court is unable to find fault in the procedure by which the Health Service denied Defendant's waiver request.

## V. Damages

Having determined that Plaintiff has validly been declared to be in default of her Health Service scholarship, and that the Health Service committed no abuse of discretion in denying her waiver request, the Court must now determine the amount for which Defendant is indebted.[9]

**8.** The Health Service also entertained a renewed waiver request after the case was called for trial. A chronology of this rather unconventional development will help avoid any misunderstanding as to which agency action the Court is reviewing in this opinion. When this case was originally called for trial on August 7, 1986, before Porter, S.D.J. (sitting by designation), counsel agreed to submit the case for decision "on the documents already before this Court." Tran. at 1. Counsel then endeavoured to stipulate to the record on which the case was to be decided. Their efforts were unsuccessful. Tran. at 21. The Court then declared, without elaboration, "[t]he case stands submitted." *Id.* No further explanation of the posture of the case is given at this point.

The Court and counsel apparently pursued the matter off the record, for on September 22, 1986, Judge Porter entered an order reading:

The Court is in receipt of a letter from the Acting Director of the Division of Health Services Scholarships, Department of Health and Human Services, dated September 16, 1986, attached hereto. In view of this, this case is put on hold until Dr. Roper has made another waiver request and we know the outcome thereof.

The letter attached indicates the Acting Director's willingness to entertain a new waiver request "[if] Dr. Roper feels that her circumstances have changed significantly since she last submitted information to us in 1984."

On November 14, 1986, the Health Service filed a motion to vacate the stay. This Court (Carter, D.J.) denied the motion on December 17, 1986, on the condition that Defendant submit the waiver request contemplated by Judge Porter's order "on or before February 2, 1987." On February 2, 1987, Defendant filed a certification declaring that she had submitted her waiver request *on that day.*

On February 26, 1987, the case was put on the July 1987 Trial List, again before Judge Porter. On July 13, 1987, Defendant filed a motion to continue. This Court denied the motion one week later. The case was not reached for trial,

and so was placed on the January 1988 Trial List. A final pretrial conference was scheduled for October 20, 1987. The parties moved to convert the pretrial conference to a status conference, but on October 12, 1987, their motion was denied and the final pretrial conference held as scheduled. The report from that conference reflects that this Court vacated Judge Porter's stay and ordered the Health Service to respond to Defendant's renewed waiver request within 20 days.

This Court has never been told what action, if any, the Health Service took on Defendant's eleventh-hour waiver request. Counsel filed a letter to the Clerk on November 16, 1987, stating simply, "Please be advised that settlement discussions in the above-referenced case has [sic] proven fruitless and this matter should be considered firm for trial." Defendant took no exception to this letter. The case was tried on February 11–12, 1988, before this judge.

The record made a trial does not reflect what action, if any, the Health Service ever took on Defendant's late waiver request. Nor has Defendant amended her pleadings to challenge any waiver denial other than that issued on July 12, 1984. The Court therefore concludes that the July 12, 1984, denial of Plaintiff's July 7, 1982, waiver request, as supplemented by the further filing of June 11, 1984, *see supra* at 81–82, is the only agency action subject to review here.

**9.** After examining the record in this case and the statute governing the calculation of damages under the Public Health Service Act, the Court concludes that the calculation of damages is not an "agency action" to which the Administrative Procedure Act applies. Title 42 U.S.C. § 254o, which lays out the formula by which "damages" are calculated (*see* n. 9, p. 88), does not specify that the Health Service is to calculate damages itself, or that it is to devise a regulatory system by which damages can be calculated. In contrast, other subsections of § 254o, such as § 254o(c)(2) governing waivers, state explicitly that the Health Service is to promulgate regulations to carry out their provisions.

The Court must first determine the principal of Defendant's debt. The majority of the financial documents submitted as evidence at trial indicate that Defendant has an outstanding principal balance of $10,091.65. *See* Joint Exhibit 4, Plaintiff's Exhibits 7 and 8. The Health Service has submitted the declarations of Jeannette Y. Pang, Chief of the Health Service's Claims Collection Coordination Staff (Plaintiff's Exhibits 34 and 35), to show, in contrast, that the $10,091.65 principal figure is inaccurate, and that Defendant actually owes a principal balance of $20,183.30. Ms. Pang's declarations, and the computer printout appended to them showing the results of Ms. Pang's calculations (attached to this opinion as Appendix A), constitute the Health Service's entire case on the damages issue.

The Court has significant difficulty with Ms. Pang's declarations and appendix. In her first declaration, dated February 8, 1988 (Plaintiff's Exhibit 34), she declares that Defendant borrowed $12,593.00 during the 1978–1979 academic year. Defendant does not dispute this. She declares that the 1978–1979 loans were issued at 13.75

and 13.875 percent interest. Defendant does not dispute this, either.

She then proceeds to "calculate" Defendant's indebtedness using the statutorily-required formula: [10]

"Applying the damages formula [set out] above, defendant was indebted to the United States, as of October 31, 1987, in the amount of $44,987.58 (broken down for administrative purposes on the attached listing as $20,183.30 in 'principal' and $24,804.28 in 'interest'). These figures reflect credit given for 170 days of service performed by defendant under her PPO agreement."

(Plaintiff's Exhibit 34, paragraph 6). Nowhere does she explain how, even using the statutory formula, she derived a "principal" of $20,183 from the $12,593 Defendant actually received in 1978 and 1979.

Turning to the computer printout, on which Ms. Pang relied, the first column of figures is marked "Support Payments" and reflects the monthly stipends and tuition advances Defendant received in 1978 and 1979. The Court would assume that these figures represented Defendant's principal, since they reflect the amount she actually borrowed. However, neither Ms. Pang's

---

Likewise, nothing in that statute suggests that Congress intended to prohibit courts from applying its formula in the course of reviewing Health Service default determinations. The Court has already determined that judicial review is not barred by the Public Health Service Act. *See* p. 84 *et seq., supra.*

Finally, nothing in the record made at trial suggests that the Health Service has adopted any policy by which it, alone, calculates a debtor's indebtedness, or that the Health Service ever set about to calculate the damages Defendant owed in any deliberate or systematic fashion. The declarations of Jeannette Y. Pang, submitted by the Health Service after the conclusion of trial (Plaintiff's Exhibits 34 and 35), were, to the best of the Court's knowledge, the Health Service's first detailed attempt at calculating Defendant's indebtedness. They refuted all earlier calculations of Defendant's indebtedness, supporting the Court's belief that the Health Service professed no expertise in calculating indebtedness under § 254o's formula. Indeed, the Health Service submitted Ms. Pang's declarations *to assist the Court* in determining the damages due, suggesting that the Health Service acknowledged that the Court was authorized to calculate the damages due here.

The Court therefore determines that the calculation of damages under the Public Health Ser-

vice Act is not an "agency action" within the meaning of the APA, but is, by a fair reading of § 254o of that Act, and at the very least, under the facts of this case, left in the first instance to judicial resolution once a breach of the debtor's underlying commitment has been established.

**10.** Title 42 U.S.C. § 2540(b)(1) provides, in pertinent part:

"[I]f an individual breaches his written contract by failing ... either to begin [his] service obligation ... or to complete such service obligation, the United States shall be entitled to recover from [him] an amount determined in accordance with the formula

$$A = 3(\emptyset) \times \frac{(t-s)}{t}$$

in which 'A' is the amount the United States is entitled to recover, (0) is the sum of the amounts paid under this subpart to or on behalf of the individual and the interest on such amounts which would be payable if at the time the amounts were paid they were loans bearing interest at the maximum legal prevailing rate, as determined by the Treasurer of the United States; 't' is the total number of months in the individual's period of obligated service; and 's' is the number of months of such period served by him."

calculations, which result in a principal of $20,183, nor the calculations reflected in earlier correspondence that set Defendant's principal at $10,091, appear to work from these figures.

Next to each "Support Payment" is the date on which it was made, and the interest rate then applicable. The next column reads "Section of PHS Law." The entire column lists one such section—751. No legend explains the significance of this statutory citation, or how it is used in calculating Defendant's indebtedness.

Next, and most puzzling, is a column headed "Principal Due." This column suggests, with an asterisk, that the figures within it reflect the triple damages the Health Service is entitled by statute to recover from delinquent debtors. It does not explain the process by which the triple damages are calculated. The Court assumes they are calculated using the statutory formula set out above.

But that formula requires consideration of the date on which the loan was made and the interest rate then applicable. The figures in the "Principal Due" column are uniform; each of the nine $429 "Support Payments" becomes a $687.57 "Principal Due" amount. They do not appear to reflect variations in date of loan or interest rate, as required under the statutory formula, leading the Court to assume they were calculated under some other formula. Neither the computer printout nor Ms. Pang's declarations explain how the "Support Payment" figures were translated into these figures marked "Principal Due," or why the latter figures are approximately 50 percent larger than the "Support Payment" figures on which they are supposedly based.

Finally, if the "Principal Due" figures were not derived from the statutory formula, the Court has no way to ascertain whether those figures credit Defendant with the time she served toward her obligation. Consequently, the Court finds that the Health Service has failed to carry its burden of proving that Defendant's principal is $20,183, as the Health Service contends. As a result, the Court will calculate damages on the basis of the principal amount actually paid to Defendant during the 1978–1979 academic year, or $12,593, the only amount undisputed here.

The Court must now determine the amount of interest due on the $12,593 principal. The Court is unable to discern, from Ms. Pang's declarations, the computer printout, the applicable statute or the record, how Ms. Pang calculated the interest due on Defendant's debts, or indeed how interest accrues on Defendant's loans.[11] The statute, 42 U.S.C. § 254$o$(b)(1), suggests that interest accrues from the date Defendant receives the loan. Defendant received nine monthly stipends under the Health Service Scholarship program between October 31, 1978 and June 30, 1979, and two lump sum tuition advances in September and October, 1978. The Court cannot determine from the record whether each instalment is considered a separate loan for interest accrual purposes, or whether interest accrues as though she had received the entire sum on one date.

Further, as suggested above, the Court cannot discern from the computer printout or Ms. Pang's declarations whether the figures under the column marked "Principal Due" have already been run through the statutory formula, and therefore account for interest accrued, or whether those figures are higher than the corresponding "Support Payment" figures for some other reason. If they have already been run

---

11. Defendant's loans were made, over the course of two academic years, at 13.75 and 13.875 percent interest. Title 42 U.S.C. § 254$o$(b)(1) states that interest on defaulted loans accrues as though, at the time the loans were made, they were "loans bearing interest at the maximum legal prevailing rate." In a letter Defendant received from the Health Service on June 29, 1982 (Plaintiff's Exhibit 5), however, she was informed that "interest is calculated from the date each Scholarship payment was made to you or on your behalf to the date you breached your agreement," suggesting that interest stops accruing at the date of default. The Court is unable to reconcile these two representations, and so assumes the validity of the calculation required by the statute.

through the statutory formula and do account for interest, the Court cannot tell why all nine $429 "Support Payments" calculate to the same $687.57 "Principal Due" figure, despite their being paid over an eight-month period at different interest rates.

Nor can the Court determine where the figures in the column marked "Interest Due" come from. Those figures range from 50 percent to 100 percent more than the "Support Payment" figures, and from 15 percent to 20 percent more than the "Principal Due" figures. The Court can only speculate that the "Interest Due" figures fluctuate because they reflect variations in interest rate and date of loan; nowhere in the record is this made clear. Further, if the figures in the column marked "Principal Due" account for interest under the statutory formula, the Court is unclear why a second interest calculation is required.

Further, in her first declaration (Plaintiff's Exhibit 34, paragraph 7), Ms. Pang asserts that "damages continue to accrue on defendant's [debt] in the amount of $7.62 per day. This figure represents the weighted average annual interest rate applicable to her debt (13.775%), times the 'principal' amount ($20,183), divided by 365." Again, Ms. Pang gives no indication of the basis or authority for her calculations. The statute governing repayment, 42 U.S.C. § 254*o*(b)(1), grants no authority to calculate damages using a "weighted annual interest rate." If this is a generally accepted accounting principal, the Health Service has not told the Court so.

Finally, Ms. Pang has calculated Defendant's indebtedness by giving Defendant credit for the days she served in Bradley. The statutory formula requires the use of months. Granted, the statute does not specify how portions of months served are to be accounted for. Ms. Pang's calculations seem to rely, as do other financial documents on record disclosing Defendant's indebtedness, on a Health Service policy requiring the use of days served rather than months. The Health Service has brought no such policy to the Court's attention. Nor has it cited any regulation that would require the use of days instead of months.

■ Consequently, the Court finds that the Health Service has altogether failed to carry its burden of proving the amount of interest due on Defendant's indebtedness. The Court will therefore calculate the amount Defendant must pay to the Health Service as though no interest had accrued.

The Court begins with the amount actually paid to Defendant during the 1978–1979 academic year, $12,593.00. Using the statutory formula, the Court calculates Defendant's indebtedness as follows:

$$A = 3(0) \times \frac{(t-s)}{t}$$
$$= 3(\$12,593) \times \frac{(12-6)}{12}$$
$$= \$37,779 \times \frac{6}{12}$$
$$= \$18,889.50$$

## VI. Order

Accordingly, it is hereby ORDERED that the Health Service's denial of Defendant's waiver request shall stand as entered, with judgment to enter for the Plaintiff against the Defendant in the amount of $18,889.50.

## APPENDIX A

DATE PRODUCED 11/23/87          DEBT CALCULATION PROGRAM

SOCIAL SECURITY NO. 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          NAME: ROPER, MAILE J.          DATE OF DEFAULT/COMPUTATION: 10/31/87

| SUPPORT PAYMENT | DATE PAID | INTEREST RATE | SECTION OF PHS LAW | PRINCIPAL DUE * | INTEREST DUE |
|---|---|---|---|---|---|
| 429.00 | 10/31/78 | 13.750000 | 751 | 687.57 | 851.39 |
| 429.00 | 11/30/78 | 13.750000 | 751 | 587.57 | 843.61 |
| 429.00 | 12/31/78 | 13.750000 | 751 | 687.57 | 835.58 |
| 429.00 | 01/31/79 | 13.875000 | 751 | 687.57 | 835.09 |
| 429.00 | 02/28/79 | 13.875000 | 751 | 687.57 | 827.76 |
| 429.00 | 03/31/79 | 13.875000 | 751 | 687.57 | 819.67 |
| 429.00 | 04/30/79 | 13.875000 | 751 | 687.57 | 811.81 |
| 429.00 | 05/31/79 | 13.875000 | 751 | 687.57 | 803.72 |
| 429.00 | 06/30/79 | 13.875000 | 751 | 687.57 | 795.87 |
| 2482.00 | 09/30/78 | 13.750000 | 751 | 3978.00 | 4972.22 |

| SUPPORT PAYMENT | DATE PAID | INTEREST RATE | SECTION OF PHS LAW | PRINCIPAL DUE* | INTEREST DUE |
|---|---|---|---|---|---|
| 6250.00 | 10/30/78 | 13.750000 | 751 | 10017.12 | 12407.51 |
| $12,593.00 | | | | $20,183.30 | $24,804 28 |

TOTAL AMOUNT DUE (PRINCIPAL & INTEREST)  $44,987.58

* 225—ACTUAL AMOUNT                                    DOCUMENT NO.
* 751 AND 338 PRINCIPAL DUE REFLECTS THE TRIPLE AMOUNT