UNITED STATES of America, Plaintiff,

v.

Eduardo Evelio AVILA, Defendant.

No. CIV–87–0289T.

United States District Court,
W.D. New York.

June 1, 1988.

Anne VanGraafeiland, Asst. U.S. Atty., (Robin Lee, of counsel), Rochester, N.Y., for plaintiff.

Githler, Macko, Reichert & Clawson (John Macko, of counsel), Rochester, N.Y., for defendant.

## DECISION and ORDER

TELESCA, District Judge.

### INTRODUCTION

Plaintiff, the United States of America ("the Government") commenced this action claiming that Dr. Eduardo Avila ("Avila"), a Public Health and National Health Service Corps Scholarship Training Program recipient, failed to perform his scholarship service obligation and thus became liable to repay the amount of his scholarship award plus interest. The United States now moves for summary judgment pursuant to Fed.R.Civ.P. 56. Avila opposes the motion, maintaining that there are material issues of fact with respect to whether he breached his obligation and the viability of his affirmative defenses.

### FACTS

Unless otherwise noted, the following facts are undisputed. Avila was a medical student at the University of Puerto Rico from 1973 through 1977. On May 22, 1974, Avila applied for a scholarship award from the Public Health Services' Health Professions Scholarship Program ("Scholarship Program"). In his application, Avila indicated his order of preference for service as follows: (1) Coast Guard; (2) FHPS; (3) Indian Health Service; (4) National Health Service Corps; and (5) Bureau of Prisons.

Although his application was originally denied, Avila was later notified that he had been selected as a recipient of a Public Health Services' ("PHS") Scholarship.

When notified that he had been selected, Avila received an "Information Bulletin for Medical and Osteopathic Students" ("Information Bulletin"), which discussed the requirements of the Scholarship Program. That Bulletin also outlined the eligibility requirements, the benefits to be received, the service obligation following training, and other general information. It also contained a series of commonly asked questions and answers, including the following:

Q. Can students be assured that they will be permitted to complete their residency training in a specialty of their choice before entering on duty in the PHS for the obligated period of service?

A. Only if they plan to specialize in family practice or general internal medicine. Requests for deferment in all other specialties will be considered when the student enters the Senior or final year of school.

(Government Exhibit D, p. 9).

Q. Can students enrolled in the Scholarship Program be assured that they will be utilized in the PHS Program and geographic area of their choice and no other?

A. No. Bear in mind that the primary purpose of the Scholarship Program is to obtain health professionals to meet the staffing needs of the various Public Health Service Program. Every effort will be made to place participants in the program of their choice, but the Service must reserve the final decision to avoid staffing imbalances. This is an unalterable condition of enrollment in the Scholarship Program.

(Government Exhibit D, p. 11)

Avila accepted the PHS Scholarship on May 15, 1975, when he signed the Notice of Scholarship Award outlining the conditions and terms of the award. (Government Exhibit E) Included among these conditions was an agreement by Avila to serve one year on active duty as a Commissioned Officer in the PHS or as a civilian member of the National Health Service Corps following completion of academic training, for each academic year of support, with a minimum of two years service. (Government Exhibit E at 1(a).) Avila also agreed that if, for any reason, he failed to complete his active duty service obligation, he would be liable for the payment of an amount equal to the scholarship payments, tuition and other educational fees paid, plus interest running from the date such payments were made. (Government Exhibit E at 2(a).) Avila received yearly stipends of approximately $7,300 for the three academic years from 1974 through 1977.

In July, 1976, Avila requested that his service obligation be deferred for four years so that he could pursue a pathology residency outside the Public Health Service. Avila indicated in a subsequent letter dated August 2, 1976, that if his four year deferment request was denied, he wished to enter the PHS as soon as he finished his academic training. (Government's Exhibit H).

On September 13, 1976 Avila signed a formal Request for Deferment form. His first preference, as indicated by the form, was a 4–year pathology residency. His second preference was a 1–year internship program offered outside of the Public Health Service. His third preference was a 1–year residency or internship program offered in a Public Health Service facility. (Government Exhibit K.) Avila received his second deferment choice, and was notified that his service obligation would be deferred for one year so that he could complete his first year of a residency (internship) program offered outside of the PHS. (Government Exhibit L.)

On March 16, 1977, Avila requested a change of deferment in order to complete his pathology residency. This request was denied, and he was again informed that his service obligation would begin on or about July 1, 1978. Avila was also informed that the final determination of his PHS assignment would be made during his deferment year of residency (internship) training. Avila was notified that "Program and geo-

graphical preference of scholarship recipients will be considered in making placement but the PHS will make final assignments based on its staffing needs." (Government Exhibit N.)

Avila graduated from the University of Puerto Rico School of Medicine in May, 1977. During the 1977–1978 academic year, he was an intern in pathology at Strong Memorial Hospital in Rochester, New York.

Avila completed and submitted a PHS Site Selection Questionnaire on which he ranked his preferred regions of assignment and the type of community he would prefer. The Midwest was not included in Avila's list of prefered geographic areas. He also noted, "Since I am being forced to interrupt my pathology residency to start serving my time with the PHS I would like to have an assignment where I would have *some* contact with pathology or research since I intend to finish my residency after completion of my obligation." (Government Exhibit O.)

By letter dated November 30, 1977, Avila was notified of his tentative assignment to the Federal Bureau of Prisons Medical Program. Avila maintains that he returned a list ranking his preferences for the ten vacancies in Bureau of Prison Facilities. According to Avila, he ranked the Federal Correctional Institution at Miami as his first preference, and the Federal Correctional Institution at Milan, Michigan, as his seventh preference. Avila further maintains that he contacted officials at the Miami Correctional Institution to discuss their medical needs and his qualifications, including his fluency in Spanish, and knowledge of Hispanic culture. Avila maintains that an official at the Bureau of Prisons informed him orally that since no one else had requested to serve at the Miami Correctional Facility, Avila "should have no problem being assigned there." (Avila's attachment A at 7). He was ultimately assigned to the Federal Correctional Institution, Milan, Michigan. In the letter advising him of his assignment, Avila was also directed:

The Office of Personnel, USPHS, will issue your Personnel Orders in the near future. You will be authorized travel for yourself and your dependents and shipment of your household effects to your duty station. We must, however, caution you *NOT* to perform travel or ship your effects until after you have received your official orders from the Office of Personnel, USPHS. (Government's Exhibit R).

Avila states that he was "shocked, disillusioned, and angry at this assignment." He felt that the public health service had not taken into consideration any of his preferences as to branches of service or site location. (Avila's attachment A at 8). Avila maintains that Mr. Krofchik of the Bureau of Prisons informed him that although ten scholarship recipients had originally been assigned to the Bureau of Prisons, seven of the ten had resigned from the scholarship program. According to Avila, Krofchik further stated that when the Bureau of Prisons became aware that only three persons were still willing to serve, "they were assigned to the three least desirable locations". (Avila's attachment A at 8–9).

Avila decided to accept the position at Milan, Michigan. In early May, 1978, he visited the location at his own expense to search for housing and arrange for schooling for his children. Upon his return to Rochester, Avila informed Krofchik of his trip, and that he needed his orders since he had to leave the University of Rochester owned apartments prior to June 21. (Avila's attachment A at 9).

Avila submitted his application to become a Commissioned Officer of the PHS, in order to fulfill his service obligation. By letter dated May 25, 1978, Avila was informed that the medical information he submitted was inadequate, and that a complete summary from his physician regarding his medical history of hypertension and followup was needed. Avila maintains that when he inquired exactly what specific information was needed, Dr. Mildred McDonald, Assistant Chief of the Medical Branch, was unable to offer him specific

requirements. (Avila's attachment A at 10). Avila never provided this information.

Avila contends that he called Krofchik on May 29 and again on May 30, and informed him that the matter needed to be resolved by June 5 so that Avila could arrange for his furniture to be moved and in order for Avila to have his commission and orders by the end of June. Krofchik stated that he was unable to help Avila. Avila called him again on June 5. Krofchik again reminded Avila not to move or ship his belongings until orders were sent from the service, or the service would not be responsible for his moving expenses. (Avila's attachment A at 10–11).

By letter dated June 5, 1978, Avila resigned from the Scholarship Program. That letter noted in pertinent part:

It is unfortunate that after 12 months filled with expectations, uncertainty and anxiety, I must write this letter to submit my resignation from any future participation and assignments in the P.H.S. However, I believe it is unavoidable after a long and frustrating experience with *that agency* despite my numerous and constant efforts to the contrary. The reasons behind this decision are multiple and too complex to explain here, as you very well know.

(Government Exhibit T.)

The PHS notified Avila that his liability under the Scholarship Program had to be paid by June 5, 1981, three years following his resignation. Avila subsequently requested a suspension of his payment obligation until completion of his residency training. He was informed that during the three year repayment period he could make any type of payment that was financially feasible for him. At the end of the three year period he would be held responsible for a lump sum of all the money he still owed the Program. If he was to find that he was unable to complete payment before the due date of June 5, 1981, he could then apply for an extension of the period of repayment. (Government Exhibit W.)

On December 5, 1980, a demand letter was sent to Avila by certified mail, return receipt requested. On February 10, 1981,

Avila wrote to the Secretary of Health and Human Services requesting a review of his situation. He was informed that the Scholarship Program would consider extending the due date of his financial indebtedness for one year, if he so requested. However, this extension would be subject to the maximum prevailing quarterly interest rate determined by the Treasurer. Avila did not file a request for an extension containing the required information.

A collection action was commenced by the United States against Avila in the District of Rhode Island in 1982. Avila and his wife then filed a Chapter 7 bankruptcy petition in the Western District of New York. Bankruptcy Judge Edward D. Hayes held that Avila's debt to the Government based on the Scholarship Program was not dischargeable in bankruptcy, 53 B.R. 933 (1985), Avila appealed this decision, but his appeal was subsequently dismissed.

## DISCUSSION

The Government has moved for summary judgment. As the party seeking summary judgment, the Government bears the initial burden of informing the Court of the basis for its motion, and identifying evidentiary material which it believes demonstrates the absence of a genuine issue of material fact. However, there is no need to support that motion with materials negating any of Avila's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether there is a genuine issue of fact, the Court must assess each motion on its merits and view the evidence in the light most favorable to Avila, the party opposing the motion, drawing all reasonable inferences in his favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and summary judgment is appropriate. *Matsushita Electrical Industrial Company, Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### I. *Avila's Liability to the Government.*

■ In accepting the Scholarship award, Avila obligated himself to serve one year in the Public Health Service or National Health Service Corps for each academic year of support received under the Program. Government Exhibit E; 42 U.S.C. § 234(e) (1975). However, on June 5, 1978, Avila notified the Government that he would not complete his service obligation under the Scholarship Program. When he refused to fulfill his service obligation, Avila became indebted for the amount of stipends received plus interest. In accordance with the regulations, and as noted on the Notice of Scholarship Award form signed by Avila:

> If, for any reason a participant fails to complete an active duty service obligation, such participant shall be liable for the payment of an amount equal to the Scholarship payments, tuition and other educational fees paid, plus interest at the maximum legal prevailing rate running from the date such payments were made. Government Exhibit E; *see also*, 42 U.S. C. § 234(f)(1) (1975).

Under the terms of the contract signed by Avila with the Government, and in accordance with the governing regulations, Avila is liable to the Government for the repayment of the Scholarship funds he received, and interest at the maximum legal prevailing rate. However, Avila has pled several affirmative defenses which he maintains reduce or bar his liability. The Court will consider these defenses in turn.

### II. *Affirmative Defenses.*

### 1. *Statute of Limitations.*

■ In his amended answer, Avila asserts that the Government's action is barred by the statute of limitations. An action by the Government for money damages based on contract must be commenced within six years after the right of action accrues. 28 U.S.C. § 2415(a). Thus, the timeliness of this action depends upon when the Government's right of action accrues.

Pursuant to the contract signed by Avila and the governing regulations, Avila was entitled to a three-year repayment period, "beginning on the date on which it is determined that a breach occurred." Government Exhibit E; 42 U.S.C. § 234(f)(1). Avila was not *required* to make any payment prior to June 5, 1981, three years after he informed the Government that he would not fulfill his service obligation. *See,* Government Exhibit W. Thus, the Government's cause of action accrued only when Avila failed to pay the lump sum demanded in full on June 5, 1981. *See United States v. Richards,* No. 86–2443 (D.Md. Mar. 24, 1987), *aff'd.,* 838 F.2d 468 (4th Cir.1988) (action accrued when debt became due three years after date of breach). The complaint in this action was filed on March 27, 1987, well within the six year period commencing June 5, 1981. Therefore, the action is not time barred.

### 2. *Selection of Avila's Service Site.*

■ Avila asserts as an affirmative defense that while he has been ready, willing and able to serve in a "mutually agreeable health manpower shortage area," he has been prevented from doing so by the Secretary's actions in unilaterally choosing his service area.

The contract signed by Avila does not explicitly state that the Secretary will unilaterally select the recipient's service site. However, the Information Bulletin Avila received prior to signing the contract clearly stated, "Every effort will be made to place participants in the program of their choice, but the Service must reserve the final decision to avoid staffing imbalances. This is an unalterable condition of enrollment in the Scholarship Program." (Government Exhibit D.) This Information Bulletin was promulgated pursuant to regulation and therefore constitutes part of Avila's contract with the Government. *See United States v. Turner,* 660 F.Supp. 1323 (E.D.N.Y.1987) (applying provisions of information bulletin); *United States v. Traxler,* 1988 WL 31939, Doc. No. 87–3955 (S.D. N.Y. March 23, 1988). In addition, on his application, Avila certified that he was

"willing to serve in any area or climate or wherever the exigencies of the Service may require." (Government Exhibit A.)

Moreover, under the terms of his contract and the governing statute, Avila was obligated to serve as a Commissioned Officer in the Public Health Service or as a civilian member of the National Health Service Corps. Pursuant to statute, it is the function of the Secretary to establish guidelines with respect to how the Corps is to be utilized, to select personnel of the Corps for assignment to the areas designated, and to determine which communities or areas may receive assistance. 42 U.S.C. § 254b(f) (1977). Thus, the Secretary had authority to determine which members of the Corps would be assigned to specific communities. Avila has cited no provision, and this Court can discover none, which limits the Secretary's power over the NHSC, or which requires the Secretary to assign NHSC members only to "mutually agreeable" areas.

I find that the Secretary had complete authority to assign Avila to the service site of his choice, and that Avila's arguments to the contrary are meritless. *See, Keepers v. Bowen*, 687 F.Supp. 1497 (D.Or.1986) (NHSC participant had no choice as to where he would fulfill his service obligations; choice remained at all times with the Secretary); *United States v. Redovan*, 656 F.Supp. 121, 127 (E.D.Pa.1986), *aff'd.*, 826 F.2d 1057 (3d Cir.1987) (defendant did not substantially perform his obligation by presenting himself for service where he wished to serve, without regard for the needs of the Program).

### 3. *Propriety of One Year Deferment.*

Avila alleges as an affirmative defense that the Secretary's refusal to allow him to commence serving upon completion of his medical school training was a breach of his Scholarship agreement. The Government maintains that the one year postgraduate clinical training requirement was necessary in order for Avila to qualify for Federal employment and fulfill his service obligation.

The Notice of Scholarship Award signed by Avila stated as a condition of the award:

For recipients receiving a degree from a school of medicine or osteopathy, the commencement of a period of obligated service may be deferred for a period of time not to exceed one year for internship (or equivalent training) and for good cause shown, at the option of the Secretary for an additional period of time for residency training. Such period of internship and residency shall not be creditable in satisfying an active duty service obligation, unless such internship and residency is served in a facility of the Public Health Service, or other facility of the National Health Service Corps.

(Government Exhibit F at 1(c).)

Thus, Avila was aware at the time he signed his contract that a deferment for internship would not be credited toward his service obligation unless the internship was served with a PHS or NHSC facility. In addition, the Information Bulletin clearly stated:

Obligatory service will commence upon completion of:

(1) Medical School, if the student applies and is accepted for participation in a Public Health Service internship or equivalent training.

(2) One year of internship or equivalent training in a non-PHS hospital, if the student is not approved (deferred) for residency training outside of the PHS.

(3) Approved residency training outside of the PHS.

(Government Exhibit D at 1.)

Thus, Avila was clearly on notice that his service obligation would commence upon completion of one year of internship in a non-PHS hospital, if he was not approved for residency training outside of the PHS or for a PHS internship.

In addition, both the contract and the statute provided that Avila could fulfill his service obligation by serving either as a Commissioned Officer of the PHS or as a civil service member of the NHSC. A year-long internship was a prerequisite to qualifying for a clinical position in either orga-

nization. See Government Exhibits 5 and 6.

Thus, when Avila's request for a four-year deferment to complete his pathology residency was denied, he was faced with the options of deferring his service for a year of internship at a program offered outside the PHS, or he could have applied for an internship program in a facility within the PHS—which would have counted towards his service obligation. Avila indicated that he preferred to do his internship outside of the PHS. (Government Exhibit K.)

Avila was aware of the possible alternatives, including the one-year deferment for an internship outside the PHS, at the time he elected to accept a scholarship. He had the option of doing an internship within the PHS which would have qualified as part of his service obligation. He chose not to do so. Therefore, his argument that the Secretary's requirement of a year's deferment for internship constituted a breach of contract is without merit.

### 4. *Delay in Issuing Orders.*

■ Although not expressly articulated as an affirmative defense in his answer, Avila claims in response to the Government's motion that the Government breached its contract with him due to "a string of broken promises, most of them oral, and the bureaucratic actions of the Public Health Service [which] prevented" Avila from fulfilling his service obligation. (Avila's Memorandum of Law at 2). Specifically, Avila cites his appointment to the Federal Bureau of Prisons position in Milan, Michigan, the late request for additional medical information, the delay in issuing his orders, and the repeated warnings that he should not move his belongings or family until the receipt of those orders as factors compelling him to resign his position. Questions concerning the construction of Avila's contract with the Government is governed by federal law. *See Priebe & Sons v. United States*, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947).

As previously discussed, the Secretary was entitled to assign Avila to the Milan,

Michigan post with the Bureau of Prisons regardless of Avila's preferences. In addition, accepting Avila's accounts of the events as true for purposes of evaluating this motion, he was requested to provide additional medical information on May 25, 1978, more than a month prior to his July 1 active duty date. No rational trier of fact could find that this request amounted to a breach of the Government's obligations under the contract or statute. The same is true of the requirement that Avila not move his family or belongings prior to receipt of his final orders in order to ensure that the Government would pay the costs of the move. Although these conditions may have inconvenienced Avila, it cannot be said on this record that they amounted to a breach. Nor has Avila established an estoppel defense based on the Government's representations. *See United States v. Roper*, 681 F.Supp. 77, 81–82 (D.Me. 1988).

Avila chose to inform the Government that he would not fulfill his service obligation as of June 5, 1978. This repudiation of his obligation occurred more than three (3) weeks prior to his active duty date of July 1, 1978. I have found nothing in the record indicating that the Government was obligated to issue Avila's orders prior to July 1, 1978. No rational trier of fact could find that the Government's actions as of June 5, 1978, when Avila repudiated the contract, amounted to a breach of the Government's obligations. I would be compelled to enter a directed verdict on behalf of the Government based on the record before me; therefore, summary judgment is appropriate. *See Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corp.*, *supra* 106 S.Ct. at 1356; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (standard for summary judgment mirrors standard for directed verdict).

### 5. *Claim of Discrimination.*

■ Avila claims that the Government treated him in an "outrageous, unfair, and degrading manner" because he is a Hispanic Cuban American, in violation of the Fifth

Amendment, and Titles VI and VII of the Civil Rights Act of 1964. He claims that the discriminatory actions of the Government render the contract unconstitutional, illegal, and unenforceable in the Courts of the United States.

In response to the Government's motion for summary judgment, the plaintiff has failed to produce any evidence indicating that the Government acted against him in a discriminatory manner due to his national heritage. When the moving party on a motion for summary judgment has carried its burden, the opponent must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corp., supra* 106 S.Ct. at 1356. Avila bears the burden of proving his affirmative defense; he has failed to produce any evidence in support of his allegation of discrimination. Where, as here, a party bears the burden of proof on an issue and fails to produce evidence in support of his claim, summary judgment is appropriate. *See, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (in ruling on motion for summary judgment, Judge must view evidence presented through prism of the substantive evidentiary burden).

6. *Amount in Issue.*

■ Avila maintains that the amount claimed by the Government is incorrect in that the Government has failed to credit him for overpayments made by the Government to the University of Puerto Rico, and that the Government has charged interest at a rate higher than the maximum permitted by law. However, Avila has failed to produce any evidence indicating that such overpayments were made or that the maximum permitted interest rate was exceeded. The Government, as the party moving for summary judgment, need not support its motion with materials negating Avila's claim. *Celotex Corp. v. Catrett, supra* 106 S.Ct. at 2553. Avila has once again failed to satisfy his evidentiary burden with respect to his allegations concerning the illegal interest rate, and therefore this de-

fense cannot prevent the entry of summary judgment.

■ With respect to his claim that the Government improperly paid tuition to the University of Puerto Rico School of Medicine when Avila was exempt from payment of tuition, Avila has produced documentary evidence indicating that this is in fact the case. (See Avila's attachments E, C, and D). I find that these documents are sufficient to raise a material question of fact concerning the amount of money Avila owes the Government. However, it has no bearing on the issue of Avila's liability. Since this is an issue which could be resolved on summary judgment with further briefing, the parties should renew their summary judgment motions on this issue.

WHEREFORE, the motion of plaintiff, the United States of America, for summary judgment is granted on the question of Avila's liability. However, material questions of fact remain concerning the amount of Avila's liability to the Government.

SO ORDERED.