UNITED STATES of America, Plaintiff,

v.

Jose Rafael MALDONADO,
M.D., Defendant.

Jose Rafael MALDONADO, M.D.,
Third–Party Plaintiff,

v.

ALBERT EINSTEIN COLLEGE OF MEDICINE OF YESHIVA UNIVERSITY, Third–Party Defendant.

No. 93 Civ. 4210 (MGC).

United States District Court,
S.D. New York.

Nov. 7, 1994.

---

**12.** Indeed, in the Complaint CM refers to Newman as its "announced agent and representative." Complaint ¶ 40.

Mary Jo White, U.S. Atty., S.D.N.Y. by Kathleen A. Zebrowski, Asst. U.S. Atty., New York City, for plaintiff.

Reaves & Yates by James A. Reaves, New York City, for defendant and third-party plaintiff.

Martin H. Bockstein by Toby Stone, Gen. Counsel for Yeshiva University, New York City, for third-party defendant.

## OPINION

CEDARBAUM, District Judge.

This is an action for breach of three contracts between the Secretary of the Department of Health and Human Services ("Secretary") and Dr. Jose R. Maldonado under the National Health Service Corps ("NHSC") Scholarship Program, 42 U.S.C. § 254*l*, *et seq.* The Government claims that Maldonado accepted $46,878 in scholarship funds to finance three years of his medical education, but upon completion of his medical education failed to commence his three-year service obligation in an area designated by the Secretary as a health manpower shortage area ("HMSA").[1] The Government seeks to recover $412,051.41, plus interest from June 11, 1993, pursuant to the liquidated damages provisions of the contracts. The Government also seeks a surcharge of 10% of the amount

---

1. The NHSC statute has since been amended to substitute the term Health Professional Shortage Area for Health Manpower Shortage Area. 42 U.S.C. § 254e(a)(1).

of the debt pursuant to 28 U.S.C. § 3011. Jurisdiction is based on 28 U.S.C. § 1345.

Maldonado asserts fourteen affirmative defenses and a third-party claim against Albert Einstein College of Medicine of Yeshiva University ("AECOM"). Maldonado moves for summary judgment on the Government's claim, contending that the Government's action is time barred and that the Secretary failed to assign him to a specific site at which to fulfill his service obligation before he was declared in default. The Government cross-moves for summary judgment. AECOM is not involved in either of the motions for summary judgment. For the reasons discussed below, Maldonado's motion for summary judgment is denied, and the Government's motion for summary judgment will be granted unless within thirty days Maldonado submits a specific request for discovery that might raise a genuine issue of material fact.

## Facts

The following facts, except where noted, are undisputed. On May 16, 1980, Maldonado signed a contract with the Secretary, accepting a scholarship award for the 1980–81 academic year at AECOM pursuant to the NHSC Scholarship Program. (Lee Dec., Ex. C.) On March 12, 1981, Maldonado signed an extension contract pursuant to which he accepted scholarship funds for the 1981–82 academic year. (*Id.*, Ex. D.) On May 4, 1983, Maldonado entered into his third and final contract with the Secretary, accepting a scholarship award for the 1983–84 academic year. (*Id.*, Ex. E.) These scholarship awards totalled $46,878.

The terms of these contracts are established by statute. 42 U.S.C. § 254*l* (f). The contract outlines the following "obligations of the Secretary": providing the applicant with a scholarship award; utilizing the applicant to provide health services; and granting a deferral so that the applicant may complete an internship or residency before commencing service. (Lee Dec., Ex. C, § A(1)–(3).) In return, Maldonado agreed to accept the scholarship award; maintain full-time enrollment and an acceptable level of academic standing; and provide one year of service for each year a scholarship is awarded in an area

designated by the Secretary as an HMSA. (*Id.*, § B(1)–(6).) In addition, the contract provided that "[i]f the applicant ... [f]ails to begin or complete the period of obligated service incurred under this contract for any reason ..., the United States shall be entitled to recover an amount equal to three times the scholarship funds awarded, plus interest...." (*Id.* § C(3).)

Following his graduation in June of 1985, Maldonado was granted a one-year deferment of his service obligation so that he could complete a residency in general surgery at Montefiore Medical Center. (Lee Dec., Ex. H.) This residency was to be completed by June 30, 1986 and Maldonado was therefore scheduled to commence his service on July 1, 1986. On August 1, 1985, Dr. Kenneth Moritsugu, then Director of the NHSC, mailed to Maldonado an Information Bulletin regarding the 1986 placement process, a timetable for site selection, and the 1986 HMSA Placement Opportunity List. (Lee Dec., Ex. K.) At that time, Maldonado was advised that he had until August 15, 1985 to complete a site selection questionnaire if he wanted his placement preference considered, and that he had until October 31, 1985 to choose a site under the Early Decision Alternative. (*Id.*) Maldonado did not submit a questionnaire, nor did he choose a site.

During the next phase of the 1986 placement process, the State or Region Assignment Period, which ran from November 1, 1985 through April 15, 1986, scholarship recipients were assigned to a region and were instructed to match themselves to an approved site within that region. On December 9, 1985, Moritsugu wrote to Maldonado, informing him that he had been assigned to Texas. In that letter, Moritsugu provided to Maldonado the name, address, and telephone number of the Regional Representative, Douglas Mahy, "who is awaiting your contact." (Lee Dec., Ex. L.) The letter further stated that if Maldonado did not match himself to a specific site by April 15, 1986, he would be assigned to a site by the NHSC. (*Id.*) Maldonado did not respond to Moritsugu's letter, nor did he contact Mahy.

On February 10, 1986, the Texas Department of Health wrote to Maldonado, stating that at that time there were no placement sites in his specialty. (Maldonado Aff. ¶ 11, Ex. G.) On March 10, 1986, Mahy wrote to Maldonado, noting that Maldonado had not yet made any attempt to contact his office as directed in the December 9, 1985 letter. He further noted that the April 15 deadline was approaching and that if Maldonado did not reply, he would be assigned randomly to a specific site or he would be placed in default of his NHSC service obligation. (Lee Dec., Ex. M.) Maldonado did not respond to Mahy's letter. On March 31, 1986, Dr. John Dyer, the NHSC Regional Health Administrator, wrote to Maldonado stating that if he did not reply within five working days, he would presume that Maldonado did not plan to fulfill his service obligation, and he would recommend that Maldonado be placed in default. (Lee Dec., Ex. N.) Once again, Maldonado did not respond.

In a mailgram dated May 1, 1986,[2] Dyer notified Maldonado that he had been assigned to the Briscoe County Clinic in Silverton, Texas, and that he should respond within two days or would risk being placed in default. (Lee Dec., Ex. O.) Maldonado asserts that he never received that mailgram. (Maldonado Aff. ¶ 15; Maldonado Dep. at 91–92.) In a letter to Maldonado, dated May 12, 1986, Moritsugu wrote that "[s]ince you have not responded to our recent mailgram, we assume that you do not intend to fulfill your NHSC scholarship obligation at the site to which you were assigned." (Lee Dec., Ex. P.) Moritsugu concluded the letter by informing Maldonado that he was recommending that he be placed in default effective July 1, 1986. (Id.) Although that letter is dated May 12, 1986, it bears two postmarks, one with the date May 30, 1986, the other with the date June 2, 1986. (Id.) The registered mail stamp indicates two notification dates, June 2 and 12, 1986. (Id.) Maldonado admits that he received the May 12 letter, but states that he cannot remember when he received it. (Maldonado Dep. at 92–93.) He

asserts that he believed that the letter's reference to the "recent mailgram" was to the March 31, 1986 letter from Dyer, and that he did not know that a specific site assignment had been made. (Maldonado Dep. at 95.) Maldonado did not respond to Moritsugu's May 12 letter.

On July 1, 1986, John E. Bird, Chief of the Debt Management Branch of the Division of Fiscal Services, wrote to Maldonado notifying him that he had been placed in default "because you do not intend to begin your service obligation." (Lee Dec., Ex. Q.) He advised Maldonado that as a result of his default he was required, within one year, to pay three times the amount of his scholarship award, plus interest. (Id.) He further advised Maldonado that any questions or requests for review should be sent to the address provided. (Id.) Maldonado did not respond to that letter. On May 12, 1987, James C. Hargrave, Chief of the Accounts Receivable Section of the Debt Management Branch, reminded Maldonado by letter that his debt must be paid in full by July 1, 1987. (Lee Dec., Ex. R.) He also offered him an opportunity to fulfill his obligation through service at an HMSA pursuant to a Forbearance Agreement. (Id.) Maldonado did not respond to that letter.

On July 24, 1987, Hargrave sent Maldonado his "final notice," which stated that his NHSC debt had become due on July 1, 1987, and that if he did not respond within sixty days, the debt would be referred to a private collection agency or the Department of Justice. (Lee Dec., Ex. S.) Hargrave further informed him that if he wished to have an explanation of the debt, an opportunity to dispute any information about the debt, or an administrative review of the debt, he should send a written request to the address provided. (Id.) Finally, Hargrave again offered Maldonado the opportunity to enter into a Forbearance Agreement. (Id.) In a notice dated August 3, 1987, the Department of Health and Human Resources informed Maldonado that his debt was being referred to

---

**2.** The Government has produced a copy of a Department of Health and Human Services verification form that includes the text of the mailgram, as well as confirmation that the message

was received by the Western Union processing center in Middletown, Virginia on May 1, 1986. (Sprague Dec. ¶¶ 2–3; Nelson–Maxey Aff. ¶¶ 3–4.)

the Internal Revenue Service for collection by offsetting his tax refunds. (Lee Dec., Ex. T.) He was also informed that he had the right to present evidence to contest the debt and that if he wished to do so, he should send a letter with the evidence within sixty days. (*Id.*)

On August 20, 1987, Maldonado responded to Hargrave's July 24, 1987 letter. Maldonado stated that his residency in urology would be completed in June of 1991, and that after "[h]aving successfully completed my residency training in Urology, I will be adequately trained to fulfill my 3–year service obligation in a Health Manpower Shortage Area." (Lee Dec., Ex. U.) He concluded by stating that "I intend to comply with my service obligation at that time and accordingly, request deferment of the obligation until completion of my residency training." (*Id.*) In a letter dated November 12, 1987, Siegel E. Young, Jr., Director of the Division of Health Services Scholarships, denied Maldonado's belated request for a deferment, reminding him that the Deferment Information Bulletin, (Lee Dec., Ex. F), which had been sent to Maldonado in August of 1984, specifically stated that only primary care specialties, such as family practice, internal medicine, pediatrics, or obstetrics, would be approved for deferment. (Lee Dec., Ex. V.) Young again offered Maldonado an opportunity to fulfill his obligation pursuant to a Forbearance Agreement. (*Id.*) Maldonado asserts that the November 12, 1987 letter from Young was the first notice he ever received that referred to his specific placement at the Briscoe County Clinic. (Maldonado Aff. ¶ 8.)

On February 26, April 14, April 18, and May 6, 1988, the NHSC sent letters to Maldonado, offering him an opportunity to participate in the newly enacted Special Repayment Program, which would allow him to satisfy his financial debt through service. (Lee Dec., Exs. W, X.) Maldonado did not participate in the Special Repayment Program, nor did he enter into a Forbearance Agreement. The Government commenced this action on June 21, 1993.

## Discussion

Summary judgment is authorized when "the pleadings, depositions, answers to inter-

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In examining the record, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos., Inc.,* 892 F.2d 1128, 1132 (2d Cir. 1989); *see Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### I. *Statute of Limitations*

■ An action by the government for money damages on a contract "shall be barred unless the complaint is filed within six years after the right of action accrues...." 28 U.S.C. § 2415(a). Maldonado was declared in default when he failed to commence his service on July 1, 1986. According to his contracts, Maldonado was required to pay money damages to the Government "within one year of the date the Secretary determines that the applicant has failed to begin ... the period of obligated service." (Lee Dec., Ex. C § C3; Ex. E § C2.) That provision is established by 42 U.S.C. § 254*o* (b)(1)(B)(i), which states:

> Any amount of damages that the United States is entitled to recover under this subsection ... shall, within the 1–year period beginning on the date of the breach of the written contract (or such longer period beginning on such date as specified by the Secretary), be paid to the United States. Amounts not paid within such period shall be subject to collection through deductions in Medicare payments pursuant to section 1395ccc of this title.

42 U.S.C. § 254*o* (b)(1)(B)(i).

The Government filed the complaint on June 21, 1993. Thus, the critical question is

whether the Government's right of action accrued upon Maldonado's default on his service obligation on July 1, 1986, or upon his failure to satisfy his financial obligation by July 1, 1987, at the expiration of the one-year statutory grace period.

All of the courts that have addressed this issue have held that the Government's right of action does not accrue until the expiration of the statutory grace period, when the applicant's debt becomes due in full. *See United States v. Richards*, No. 87–1103, 838 F.2d 468, 468, 1988 WL 4575, at *1 (4th Cir.1988); *United States v. Ewell*, No. 91–760, slip op. at 8 (N.D.Tex. Jan. 15, 1993); *United States v. Margolin*, No. 92–515, slip op. at 4–5 (N.D.Ca. Nov. 17, 1992); *United States v. Grise*, No. 91–616, slip op. at 7–8 (D.Or. July 9, 1992); *United States v. Avila*, 687 F.Supp. 778, 783 (W.D.N.Y.1988); *United States v. Potts*, No. 87–1257, 1988 WL 19625, at *5 n. 6 (D.D.C. Feb. 23, 1988); *United States v. Hogan*, 43 B.R. 117, 118–19 (D.Ariz.1984). These courts reasoned that since the applicant is not required to make any payment prior to the expiration of the statutory grace period, the Government's right of action cannot accrue until the applicant fails to make the payment by the end of that period.

The *Richards, Avila,* and *Hogan* courts each interpreted a prior version of the statute which provided that an applicant was required to pay back the actual amount of his scholarship award within three years. *See* 42 U.S.C. § 234(f)(1) (repealed 1977) ("Any amount which the United States is entitled to recover ... shall, within the three-year period beginning on the date the United States becomes entitled to recover such amount, be paid to the United States.").[3] Maldonado argues that the current provision, § 254*o* (b)(1)(B)(i), requires immediate payment and that these cases are therefore inapposite. Although Maldonado concedes that both his contracts and the statute provide a one-year payback period, he contends that this provi-

sion does not bar the Government from filing suit before that one-year period has expired.

For this proposition, Maldonado relies on *United States v. Gary*, 963 F.2d 180 (8th Cir.1992), in which the court stated that "[w]hen [the scholarship recipient] defaulted, the United States had an immediate right to recovery of the scholarship award plus interest." 963 F.2d at 184. However, the *Gary* court was not addressing the statute of limitations issue, and that statement cannot be read as a determination that the Government's right of action accrues immediately upon default. The *Gary* court held that once the scholarship recipient was placed in default of his service obligation, the Secretary's decision as to whether he would be allowed to satisfy his obligation through service in lieu of paying damages was "wholly at the discretion of the Secretary." 963 F.2d at 183. Thus, the Government had an "immediate right" to recover damages from the defendant, as opposed to being required to consider whether alternative service could be arranged. Maldonado also cites *United States v. Gross*, 725 F.Supp. 892 (W.D.La.1989). However, like the *Gary* court, the *Gross* court did not address the question of when the Government's right of action accrues, and simply held that "[o]nce the recipient is in default status, the service option terminates and the recipient must repay the debt financially." 725 F.Supp. at 893. Neither court even addresses the provisions of § 254*o* (b)(1)(B)(i).

Maldonado also relies on *Matthews v. United States (In re Matthews)*, 150 B.R. 11 (Bankr.W.D.Penn.1992), in which the court interpreted 42 U.S.C. § 254*o* (d)(3)(A). That section provides that:

> Any obligation of an individual under the Scholarship Program (or a contract thereunder) ... for payment of damages may be released by a discharge in bankruptcy under Title 11 only if such discharge is granted after the expiration of the five-year period *beginning on the first date*

---

3. The Conference Report indicates that when that provision was amended to its present form (§ 254*o* (b)(1)(B)(i)), a compromise was reached between the House of Representatives, which had proposed a three-year payback period and damages of twice the scholarship award, and the Senate, which had proposed a sixty-day payback period and damages of three times the scholarship award. H.R.Conf.Rep. No. 1612, 94th Cong., 2d Sess. 107–08 (Sept. 17, 1976), U.S.Code Cong. & Admin.News 1976, 4947.

*that payment of such damages is required,* and only if the bankruptcy court finds that nondischarge of the obligation would be unconscionable.

42 U.S.C. § 254o (d)(3)(A) (emphasis added). The *Matthews* court held that the first date that payment was required was the date that the NHSC declared the applicant in default of his service obligation. Maldonado, in an effort to demonstrate that the current provision requires immediate payment, compares *Matthews* to an earlier decision, *United States v. Dillingham (In re Dillingham),* 104 B.R. 505 (Bankr.N.D.Ga.1989), in which the court analyzed the dischargeability of a scholarship recipient's debt under the prior three-year grace period.

However, the *Matthews* court did not even mention the one-year grace period provided by § 254o (b)(1)(B)(i), perhaps because the court construed § 254o (d)(3)(A) as requiring the court to calculate the five-year period from the first date the payment obligation began, and thus decided that the grace period was irrelevant. In addition, the *Dillingham* court was construing the terms of a Bankruptcy Code provision regarding the general dischargeability of debts. That provision stated that a scholarship debt is not dischargeable in bankruptcy unless "such loan first *became due* before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition...." 11 U.S.C. § 523(a)(8)(A) (emphasis added).[4] The *Dillingham* court held that the debtor's loan first became due after the expiration of the then three-year grace period. 104 B.R. at 509–10. The best explanation for the different outcomes in these two bankruptcy cases is not the change in the NHSC statute regarding the grace period, but instead the different dischargeability provisions that the courts examined.

Maldonado contends that the July 1, 1986 letter, which notified him of his default, supports his understanding that § 254o (b)(1)(B)(i) requires immediate payment, and that the Government's right of action therefore accrued on the date of his default on his service obligation. However, that letter does not help Maldonado and, in fact, adds further support for the Government's position. That letter clearly states that "[t]his debt must be paid within one year from the date of this letter," and that if it is not paid "by the end of the specified time, we will refer your account to a private collection agency to pursue collection and/or to the Department of Justice for litigation." (Lee Dec. Ex. Q at 1–2.) The letter further states that "[y]ou may elect to pay your debt immediately or by monthly or quarterly installments." (*Id.* at 2.) The letter simply restates the terms of Maldonado's agreement according to the statute and as provided in his contracts. The fact that the Government offered to let Maldonado pay immediately or by installments does not change the fact that the Government specifically stated that it would not pursue litigation until the end of the statutory grace period.

There appears to be no basis in the language of the contracts or the statute for treating the one-year grace period provided in § 254o (b)(1)(B)(i) differently from that provided in the prior statute. The contracts signed by Maldonado indicate that he agreed to pay the Government damages within one year of his failure to begin his service obligation, in accordance with § 254o (b)(1)(B)(i). Thus, Maldonado did not breach that agreement until July 1, 1987, when he failed to pay his damages or secure some other arrangement with the Secretary to satisfy his debt through service. Accordingly, the Government had no statutory or contractual right to bring this action prior to the expiration of the one-year grace period. Any other interpretation would render meaningless the statutory and contractual language which provides a one-year grace period.

■ This one-year grace period, in effect, creates a two-part obligation on the part of each scholarship recipient: a service obligation and a financial obligation. *See Gary,* 963 F.2d at 183–84; *Gross,* 725 F.Supp. at 893. Once a scholarship recipient defaults on his service obligation, his debt to the Government becomes a financial one that must be satisfied within one year. Until that one-

---

4. That provision has since been amended. *See* Pub.L. 101–647, § 3621(2) (1990).

year period expires, the scholarship recipient is not yet in default and the Government's right of action cannot yet accrue.

■ Maldonado argues that the provisions of § 254*o* (b)(1)(B)(i) cannot be interpreted as creating a "service" obligation and a separate "financial" obligation. He contends that the financial obligation is merely the consequence of the breach of his service obligation, and that the financial obligation is fixed on the date of default and remains unchanged after the expiration of the one-year grace period. However, while it is true that Maldonado's financial obligation became fixed on the date he failed to commence his service, this does not mean that the Government's right to sue Maldonado necessarily arose on that same date. Indeed, by granting Maldonado a one-year grace period, the Secretary provided Maldonado with an opportunity to avoid litigation by obtaining a loan to satisfy his debt or by arranging with the Secretary to satisfy his debt through service by entering into a Forbearance Agreement or a Special Repayment Program, both of which were offered to Maldonado. Had this suit been filed prior to July 1, 1987, the Secretary would have been in breach of that agreement.

■ Maldonado contends that the language in § 254*o*(b)(1)(B)(i) which provides that the payback period shall be one year "(or such longer period ... as specified by the Secretary)" undermines that conclusion. He argues that the one-year grace period, which can be extended by the Secretary, cannot be read to delay the accrual of the Government's right of action because it would give the Government the right to unilaterally extend the statute of limitations. He relies on *United States v. Cocoa Berkau, Inc.*, 990 F.2d 610 (Fed.Cir.1993) and *United States v. Commodities Export Co.*, 972 F.2d 1266 (Fed.Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1993), which held that the Government's right of action for breach of a customs bond accrues when all the events necessary to fix the liability of the defendant have occurred, and that the Government may not unilaterally delay that accrual. *Cocoa Berkau*, 990 F.2d

at 613; *Commodities Export*, 972 F.2d at 1270.

In *Cocoa Berkau*, the Government made a formal demand for payment more than five years after the defendant breached a customs bond, and the court rejected its argument that its right of action did not accrue until that formal demand was made. The *Commodities Export* court addressed facts similar to those in *Cocoa Berkau*, and stated that "[w]ithout agreement of the parties or statutory obligations delaying the institution of suit," the cause of action would accrue when liability was fixed; that is, on the date of the breach. 972 F.2d at 1271. The court stated that the purpose behind the statute of limitations would be undermined if it were to "permit a single party to postpone unilaterally and indefinitely the running of the statute of limitations." *Id.*

The facts in *Cocoa Berkau* and *Commodities Export*, however, are very different from the present case. The parties here agreed to delay the institution of suit. When Maldonado signed his NHSC contract, he agreed to repay his debt within one year of any default on his service obligation. The Secretary, by contractually providing the one-year grace period, agreed to delay any suit for default by one year. The Government, had it sued immediately upon default, would have violated that agreement. Furthermore, the one-year grace period was not extended by the Government in this case and Maldonado's debt was demanded in full in July of 1987. The fact that the statute may permit the Secretary in her discretion to extend the one-year grace period and the fact that this provision could potentially be abused should not affect this case.

■ Maldonado argues further that because there is no specific restriction in the statute on the Government's right to institute litigation, one should not be implied through the provision for a one-year grace period. He points to the second sentence of § 254*o* (b)(1)(B)(i), which provides that "[a]mounts not paid within such [one-year] period shall be subject to collection through deductions in Medicare payments." Maldonado argues that because Congress specifically restricted the Government's right to collect an unpaid

debt through Medicare deductions until after the one-year period, it would have included a similar provision regarding the Government's right to bring suit had it intended such a limitation.

This argument is without merit. No restriction on the Government's right to sue is being implied. Indeed, as stated above, § 254(b)(1)(B)(i) itself restricts the Government's right to sue by granting to Maldonado one year in which to satisfy his debt. The fact that the provision regarding Medicare deductions, which was added in 1987,[5] reiterates the fact that a scholarship recipient cannot be forced to make any payments until the one-year grace period expires cannot be construed as an indication that Congress did not intend to restrict the Government's right to bring suit.

■ Maldonado's argument regarding the tolling of the statute of limitations period for Special Repayment Program ("SRP")[6] applicants also must fail. That program provides that the statute of limitations period for any action by the Government to enforce a scholarship recipient's financial obligation will be tolled once the Secretary receives notice that the recipient intends to enter into an SRP agreement until such time as the Secretary decides that it will not grant the request. Maldonado argues that the absence of any analogous tolling provision for the one-year grace period suggests that Congress did not intend to delay the Government's institution of suit. However, the delay in the accrual of the Government's right of action, required by the one-year grace period, is not analogous to a tolling of the statute of limitations. The reason that the Government's right of action does not accrue until the expiration of the one-year period is that a scholarship recipient does not actually breach his contract until he fails to satisfy his financial obligation within one year's time. The SRP, in fact, provides an example of how a scholarship

recipient might take advantage of the one-year grace period to avoid litigation.

■ Finally, Maldonado argues that in a memorandum of law filed in 1989 in a case in the Northern District of New York, (Reaves Aff., Ex. 11), the Government "admitted" pursuant to Fed.R.Evid. 801(d)(2) that the statute of limitations period begins to run on the date the scholarship recipient is placed in default of his service obligation.[7] Maldonado contends that that admission precludes the Government from arguing in this case that the statute of limitations period does not begin to run until the expiration of the one-year grace period. Maldonado cites no authority for this novel proposition. Indeed, what Maldonado essentially is arguing is that the Government is estopped from putting forth a different interpretation of the NHSC statute than it proposed in a different case five years earlier. The Government cannot be estopped in this manner, and Maldonado has not even suggested that he in any way relied on this prior interpretation of the statute of limitations provision, nor could he possibly show that such reliance would have been reasonable. See generally, Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("the Government may not be estopped on the same terms as any other litigant"); Patton v. Dole, 806 F.2d 24, 30 (2d Cir.1986) ("A claim for equitable estoppel typically involves a situation in which an employee of an administrative agency incorrectly represents the law in rendering advice to a citizen who relies on that representation to his detriment.")

In sum, because the terms of Maldonado's contract did not require him to pay his debt in full until July 1, 1987, the Government's right of action for breach of contract did not accrue until he failed to make full restitution by that date. Thus, the Government's action is not time barred.

---

**5.** See Pub.L. 100–203, § 4052(b) (1987).

**6.** The Special Repayment Program, introduced in 1987, offered scholarship recipients who had breached their contracts an opportunity to satisfy their financial debt through service at an HMSA. See 42 U.S.C. § 254o note.

**7.** It is worth noting that on the facts in the Northern District case, the one-year grace period was irrelevant in that the case was filed within six years of the date of both the breach of the service obligation and the breach of the financial obligation. (Reaves Aff., Ex. 11, at 24.)

## II. Breach of Contract

■ Maldonado acknowledges that he received NHSC scholarship funds and was therefore obligated to provide three years of service in an area to be determined by the Secretary. (Def. 3(g) Stmt. ¶ 3.) However, he contends that because the Secretary failed to assign him to a specific HMSA, he was improperly placed in default. The Government contends that summary judgment is warranted because the Secretary did, in fact, assign Maldonado to a specific site and that Maldonado cannot defeat summary judgment simply by asserting that he did not receive notice of that assignment.

The NHSC statute provides that "[t]he Secretary shall assign individuals performing obligated service in accordance with a written contract under the Scholarship Program to [HMSA]s...." 42 U.S.C. § 254m(d). The Government asserts that the Secretary fulfilled her obligation by assigning Maldonado to the Briscoe County Clinic in Silverton, Texas. The Government further asserts that Maldonado was notified of this assignment in May of 1986, but failed to respond. Maldonado, on the other hand, asserts that he never received a letter notifying him that his site-specific assignment had been made, and that the Government has not offered any proof that the notice was sent or that Maldonado received it. Maldonado argues that without that proof the Government's claim must fail because it cannot demonstrate that the Secretary fulfilled her obligation under the statute to assign him to an HMSA.

To support his argument, Maldonado relies exclusively on the Ninth Circuit's opinion in *United States v. St. Thomas*, 966 F.2d 476 (9th Cir.1992). The *St. Thomas* court found that the defendant was erroneously placed in default because the Secretary had assigned the defendant to a three-state region, but had failed to assign him to a specific service site within that region in accordance with § 254m(d). However, because the Secretary assigned Maldonado to a specific site, *St. Thomas* is inapposite. Although Maldonado contends that the Secretary never assigned him to a specific site, the mailgram dated May 1, 1986, which stated that Maldonado had been assigned to the Briscoe County Clinic in Silverton, Texas, belies that contention. While it remains disputed whether Maldonado ever received the mailgram, the Government has offered undisputed proof that a communication assigning Maldonado to the Briscoe County Clinic was transmitted to the Western Union Processing Center in Middletown, Virginia on May 1, 1986, thus establishing that the Secretary in fact made the assignment. Although Maldonado suggests that the May 1 mailgram from Dyer is not the official notice of his assignment,[8] that does not change the fact that a site-specific assignment had been made at least as early as May 1, 1986.

■ Maldonado argues that even assuming that an appropriate assignment had been made, summary judgment is not warranted because there remains a genuine issue of material fact as to whether he received notice of that assignment. The Government has submitted evidence that, according to standard procedure, once the mailgram was transmitted to Western Union in Middletown, Virginia it should then have been sent to the Western Union Facility in the Bronx and hand delivered to Maldonado. However, since the sender did not request confirmation of delivery, there is no evidence that conclusively demonstrates that Maldonado actually received that mailgram. (Nelson–Maxey Aff. ¶¶ 1–11.)

The Supreme Court has stated that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, the question presented is whether the Government must establish that Maldonado actually received the May 1 mailgram assigning him to the Briscoe County

---

8. Barbara Lee, Deputy Director of the Division of Scholarships and Loan Repayments, stated in her deposition that Maldonado's site-specific assignment would have been made by Moritsugu and that she believed that Maldonado should have been sent his official notice on or about April 15, 1986. *See* Lee Dep. at 56–57; 85–86.

Clinic, or whether it is sufficient to show that the Secretary in fact made the assignment. For purposes of deciding this motion, it will be assumed that Maldonado did not receive the May 1 mailgram.

As an initial matter, it should be noted that while the Secretary indisputably has the obligation to make a site-specific assignment for each scholarship recipient, there is no provision in either the NHSC contracts or statute that specifies how a scholarship recipient shall be informed of that assignment. Thus, this case provides an opportunity to explore the obligations of both the Secretary and the scholarship recipient under the NHSC contracts and statute.

In order to understand the parties' obligations, it is helpful to review the notices that Maldonado acknowledges that he received. First, Maldonado does not dispute that he was informed that his service obligation was scheduled to commence on July 1, 1986. In addition, Maldonado has admitted that he received the December 9, 1985 letter, in which Moritsugu notified him that he had been assigned to Texas and that he should contact Mahy, the Regional Representative, in order to arrange his placement. (Maldonado Aff. ¶ 10.) Maldonado also has admitted receiving the March 31, 1986 letter, in which Dyer informed him that if he did not reply within five working days it would be presumed that he did not intend to fulfill his service obligation and he would be placed in default. (Maldonado Dep. at 95.) Thus, before the Secretary actually made Maldonado's site-specific assignment, Maldonado was on notice that the Secretary was expecting his cooperation in the assignment process and that if he had any questions regarding his assignment he should contact either his Regional Representative or Moritsugu. Nevertheless, Maldonado made no effort to contact anyone about his assignment and seems to have simply ignored those letters.

Maldonado also admits that he received the May 12, 1986 letter which stated, in part, that "[s]ince you have not responded to our recent mailgram, we assume that you do not intend to fulfill your NHSC scholarship obligation *at the site to which you were assigned.*" (Lee Dec., Ex. P) (emphasis added). That letter also informed Maldonado that he would be placed in default on July 1, 1986. Maldonado offers no explanation for his failure to contact anyone to learn where he had been assigned, or to make clear that he did intend to commence his service on July 1, 1986.[9]

Maldonado, in fact, offers no meaningful explanation for his failure to commence service as scheduled on July 1, 1986. Instead, Maldonado has submitted carefully worded affidavits and deposition testimony which avoid that issue and focus only on the Secretary's failure to make a proper assignment. For example, Maldonado states:

> NHSC never made or communicated to me a site specific assignment to a location at which I was obligated to fulfill my service obligation. Therefore, NHSC failed to comply with its own placement procedures and statutory mandate and erroneously declared me to be in default. In short, I never refused to fulfill a valid site-specific placement assignment and consequently I did not breach my NHSC Scholarship Contracts service obligation.

(Maldonado Aff. ¶ 6.) And, in response to the question, "In May of 1986, were you under the assumption that you had to complete your service obligation starting July 1st, 1986?," Maldonado stated, "It was my understanding that if I was placed by the National Health Services Corps for July 1, 1986, that I would have to comply with that service obligation at that time." (Maldonado Dep. at 96.)

An NHSC scholarship recipient cannot simply ignore correspondence from NHSC officials, particularly when that correspondence specifically directs the recipient to contact a particular person within a specific period of time. Furthermore, Maldonado

---

9. When asked whether he "consider[ed] calling the National Health Services Corps to see whether or not they had placed [him] for service effective July 1st, 1986," Maldonado responded, "I don't recall if I made that consideration." (Maldonado Dep. at 96.) And when asked whether it "at all concern[ed] him that [he was] going to be placed in default of [his] service obligation effective July 1st, 1986," Maldonado replied, "At some point, it did." (*Id.* at 95.)

had notice that his approved deferment for his general surgery residency expired on June 30, 1986, and that he was obligated to commence service on July 1, 1986. Assuming that he did not receive the May 1 mailgram, Maldonado should have contacted Moritsugu, Mahy, or Dyer to inquire if an assignment had been made so that he could commence his service according to schedule. Moreover, upon receipt of either the letter dated May 12 or the notice of default dated July 1, 1986, Maldonado had an obligation to contact someone at the NHSC to make clear that he did intend to fulfill his service obligation and that he had not yet received an assignment.[10] Instead, Maldonado chose to allow more than twelve months to go by after he received notice of default before making any response.

When Maldonado agreed to accept $46,878 in NHSC funding to finance his medical education, he made a commitment to provide three years of service in an HMSA. Although Maldonado had notice that his service was to commence on July 1, 1986, it appears that he simply decided to do nothing and to hope for some technical defect to avoid that service. However, Maldonado may not avoid his service obligation, nor may he avoid summary judgment, simply by disputing whether he actually received one piece of correspondence from the NHSC, after having ignored several others. It is clear from the record that the Secretary did not fail to make a site-specific assignment and that the Secretary sent Maldonado enough information to put him on notice that an assignment would be made sometime after April 15, 1986, and that such an assignment had in fact been made. In contrast, Maldonado made no good faith effort to live up to his obligation in the contract, and so was properly placed in default.

### III. *Affirmative Defenses*

▉▉▉▉ Maldonado asserts a laundry list of affirmative defenses, none of which has merit. Three of these defenses are based on

Maldonado's contention that he should have been allowed to defer his service to complete his urology residency and that his current practice as a urologist satisfies his obligation under the contract. First, because Maldonado did not request a deferment until a full year after he was placed in default, the Secretary's decision to deny that request was discretionary and is not reviewable under the Administrative Procedure Act. 5 U.S.C. § 701(a)(2); *see United States v. Gary,* 963 F.2d at 183–84. In any event, the Secretary's decision was not arbitrary and capricious because Maldonado had been informed that only residencies in primary care specialties would be approved for deferment.

▉▉▉▉ Second, according to both the contracts and the statute, the Secretary has the discretion to assign scholarship recipients to a specific site for service. *See United States v. Lopez,* No. 91–730, slip op. at 21–22 (S.D.N.Y. March 29, 1993). Maldonado cites no authority for the proposition that the Secretary abused her discretion in failing to assign Maldonado to a site that he had chosen, or in deciding not to retroactively approve Maldonado's current practice as satisfying his obligations under the contracts. Indeed, the NHSC program is not intended "as a mechanism solely to subsidize health professional education" but "as a means to overcome a geographic maldistribution of health professionals." S.Rep. No. 887, 94th Cong., 1st Sess. 201 (1975). Thus, the Secretary must have the ability to place scholarship recipients in areas that she decides are most in need of medical services.

▉▉▉▉ Next, Maldonado asserts that his financial obligations should be waived pursuant to 42 U.S.C. § 254o (d)(2). That section provides that:

> The Secretary shall by regulation provide for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program (or a contract thereunder) ... whenever compliance by the individual

---

**10.** Maldonado's inability to recall whether he received the May 12 letter before or after he was placed in default is irrelevant. Even if he received that letter after he had been placed in default, he was still obligated to advise the NHSC that he had been placed in default improperly. In addition, the actual notice placing Maldonado in default specifically advised him where to direct any questions, and Maldonado failed to respond to that notice as well.

is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable.

42 U.S.C. § 254o (d)(2). The Government argues that Maldonado cannot now raise a claim for waiver because he never raised any such request with the Secretary, nor did he submit any information necessary for the Secretary to make a waiver determination. In *United States v. Barry*, 904 F.2d 29 (11th Cir.1990), the court refused to consider a request for waiver on the ground that the scholarship recipient had not followed the procedure set forth in the regulations. *Id.* at 31. According to 42 C.F.R. § 62.12(b)(1), a scholarship recipient "may seek a waiver or suspension of the service or payment obligations incurred under this part by written request to the Secretary setting forth the bases, circumstances, and causes which support the requested action." Maldonado failed to comply with this regulation and this claim will therefore not be considered. In any event, Maldonado has provided no evidence that he is eligible for waiver. Finally, Maldonado's contention that he was denied the right to pursue these administrative remedies is disingenuous, in light of his failure to respond to countless letters which advised him of his opportunity to contest his default.

▮▮▮▮ Maldonado also asserts that he could not have commenced service on July 1, 1986 because he did not pass his FLEX examinations until February of 1988. Section 254o (b)(1)(A) states that "if an individual breaches his written contract by failing *... for any reason ...* to begin such individual's service obligation ... the United States shall be entitled to recover [treble damages plus interest]." 42 U.S.C. § 254o (b)(1)(A) (emphasis added); *see also* Lee Dec.Ex. C, § C(3). Thus, impossibility of performance is not a defense. *See United States v. Vanhorn*, 20 F.3d 104, 112 (4th Cir.1994); *United States v. Gross*, 725 F.Supp. at 894 (W.D.La. 1989) ("The default provision ... is indifferent as to the reason why an individual fails to begin performing his service obligation.") In any event, as stated above, the NHSC statute recognizes that "compliance by the individual [may be] impossible" and that such an individual is entitled to request from the

Secretary a waiver or a suspension of his service obligation on that basis. 42 U.S.C. § 254o (d)(2). However, Maldonado never informed the Secretary of his failure to pass the exams, nor did he ever request that his service obligation be waived or suspended.

▮▮▮▮ Maldonado's defenses of waiver, estoppel and laches are without merit. First, the defense of laches is unavailable when the Government is enforcing its rights. *United States v. Schmitt*, 734 F.Supp. 1035, 1056 (E.D.N.Y.1990) (citing *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) ("It is well settled that the United States is not ... subject to the defense of laches in enforcing its rights.")) Second, as stated earlier, "the Government may not be estopped on the same terms as any other litigant." *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224. At the very least, Maldonado would have to demonstrate that he relied to his detriment on a misrepresentation by an NHSC official. *See id.*, 467 U.S. at 59–60, 104 S.Ct. at 2223–24. Maldonado has made no such showing. His defense of waiver is similarly without factual basis.

▮▮▮▮ Maldonado's argument that the treble damages provision is a penalty has been rejected routinely. *See United States v. Turner*, 660 F.Supp. 1323, 1332 (E.D.N.Y. 1987) (citing cases). "The general rule for determining the enforceability of a liquidated damage clause in a federal contract requires a finding by the court that the provision is a 'fair and reasonable attempt[ ] to fix just compensation for anticipated loss caused by breach of contract.'" *Id.* (quoting *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947)). It cannot be said that the treble damages provision is not a fair and reasonable attempt to calculate the loss suffered by the Government when a scholarship recipient fails to provide service to a medically underserved area of this country.

▮▮▮▮ In his final affirmative defense, Maldonado alleges that the Secretary erroneously overpaid scholarship funds to AECOM because AECOM had awarded Maldonado a

50% scholarship. Maldonado's arrangement with AECOM cannot affect his obligation to satisfy the debt that he agreed to pay to the Secretary. If Maldonado's assertions have any merit, he may pursue them in his third-party claim against AECOM.

█ Accordingly, since Maldonado's affirmative defenses are without merit, the Government is entitled to recover the liquidated damages outlined in the NHSC contracts and statute. However, the Government is not entitled to recover the 10% surcharge pursuant to 28 U.S.C. § 3011 since this action involves neither a pre-judgment nor post-judgment remedy. *See Lopez,* slip op. at 32–33; *United States v. Mauldin,* 805 F.Supp. 35, 36 (N.D.Ala.1992).

Finally, Maldonado argues that the Government's motion for summary judgment should not be considered on the ground that the affidavits submitted regarding the question of whether Maldonado received the May 1 mailgram are not based on personal knowledge. However, since it is assumed for purposes of this motion that Maldonado did not receive the May 1 mailgram, this argument is without merit. Maldonado's contention that additional discovery on this issue is required is similarly without merit. Maldonado also contends that additional discovery is necessary to support his affirmative defenses, but cites no specific requests for discovery that relate to the affirmative defenses. Indeed, any information that might support the affirmative defenses would seem to be peculiarly within Maldonado's own knowledge.

Nevertheless, Maldonado is granted thirty days from the date of this Opinion to submit a specific request for discovery that might raise a genuine issue of material fact in light of this Opinion. If such a specific request is not received within thirty days, judgment will be entered in accordance with this Opinion.

SO ORDERED.